[Crim. No. 15048. In Bank. Aug. 2, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID LEON PERRY et al., Defendants and Appellants.

**COUNSEL**

E. C. Sylvia and David W. Lowe, under appointments by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci and George R. Nock, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—Harry Redmon, David Perry, "Rockey" Dixon, and a person identified as "John Doe" Ott were jointly charged by indictment with murder and with conspiracy to commit murder. Redmon, Perry, and Dixon pleaded not guilty to both counts of the indictment and were jointly tried by jury; "John Doe" Ott had not been apprehended by the time of trial. At the close of the prosecution's case, the trial court ruled that the principal witness for the prosecution, Diana Moore, was an accomplice as a matter of law and entered a judgment of acquittal on both counts of the indictment as to Dixon because the prosecution failed to present evidence corroborating his guilt. Thereafter, the court dismissed the conspiracy count as to the remaining defendants and submitted the murder count to the jury. The jury returned verdicts finding Redmon and Perry guilty of murder in the first degree. Jury trial was waived on the penalty issue, and both defendants were sentenced to life imprisonment.

Defendants appeal from the judgments entered on the jury verdicts. Assuming, as we must, that Diana Moore is an accomplice, we are initially confronted with the question of whether her incriminating testimony is sufficiently corroborated as required by Penal Code section 1111 by independent evidence establishing consciousness of guilt on the part of the defendants. In a related contention, Perry claims that evidence seized from his vehicle should have been suppressed because the search of that vehicle without a warrant violated his Fourth Amendment rights. Furthermore, both defendants contend that evidence of other crimes and wrongful acts was improperly admitted. In addition, Perry contends that Diana Moore waived the psychotherapist privilege so the trial court should have granted his request to review certain medical records concerning her treatment; that the court incorrectly refused to instruct the jury to return a special finding of fact or a special verdict; and that the court improperly denied permission to play a certain tape recording in its entirety before the jury. Redmon contends that, as a matter of law, the evidence is insufficient to support a guilty verdict as to him; that the trial court erroneously refused to examine prospective jurors separately, outside the presence of other veniremen; that by adopting a procedure whereby the testimony of one witness was taken outside the presence of the jury and then read to the jury, the court violated the Sixth Amendment right of confrontation; that the court improperly prevented the defense from reading several pages of a transcribed statement to the jury; that the court incorrectly refused to instruct the jury that evidence found in Perry's

car could be considered only against Perry for a limited purpose; that the court erroneously failed to instruct the jury on second degree murder and manslaughter; and that the prosecutor committed prejudicial misconduct.

An examination of defendants' numerous contentions reveals no reversible error, and therefore the judgment of conviction is affirmed as to both defendants.

## The Facts

On December 7, 1967, the body of Ronald Lee Roy was discovered in the Carquinez Heights area of Vallejo. An autopsy of Roy's body revealed three bullet wounds in the head and three facial lacerations. The pathologist who conducted the autopsy testified that the lacerations had occurred before death and were probably inflicted by a hard, blunt object. The coroner of Solano County was of the opinion that the victim had been killed less than 12 hours before the body was found.

The day after Roy's body was discovered, his automobile was found parked on a Vallejo street. Sergeant Kenneth Odiorne, the investigating officer, examined the vehicle. He noticed that the edge of the trunk lid, the back bumper, and the door handles were cleaner than other parts of the car; that the trunk contained a large quantity of blood and some flesh tissue; that the latch on the inside of the trunk was scratched; and that paint from the latch was stuck to a tool found in the trunk.

The investigation of Roy's death did not progress significantly until August of 1968 when a local barber told Sergeant Odiorne that Diana Moore had information concerning the killing. At trial, the barber testified that Diana came into his shop in early 1968 and told him that she was facing a sentence for parole violation, a sentence she particularly did not want to serve because she was a drug addict. Diana told the barber that her habit would probably cost $100 per day but that "her people" furnished her with narcotics to keep her from divulging certain information. The information of which Diana had knowledge was that "her people" had murdered Roy.

On August 12, 1968, while Diana was in custody awaiting trial on an unrelated charge, Odiorne talked with her about Roy's murder. Diana led Odiorne to the place where the corpse had been discovered and told him a version of the commission of the crime.

At trial, Diana was called as a witness and, pursuant to Penal Code

section 1324, was granted immunity from prosecution. Her testimony as the same relates to the murder of Roy is hereinafter summarized.

Diana was 19 years of age, the mother of an illegitimate child, and an addict whose drug habit was supplied by defendant Perry. At the time of the killing, she lived with her parents but subsequently moved into Perry's residence.

On the evening of December 6, 1967, Diana and Perry drove around Vallejo in Perry's car, smoking marijuana as they drove. At approximately 10 p.m., they arrived at the Fireplug 6, a beer parlor, where Diana consumed several beers. At 10:30 p.m., Perry told Diana to meet him outside the Fireplug 6 in 45 minutes, and then he departed. Diana left at 11:15 as instructed. She saw Perry's car parked across the street, approached it and seated herself in the front passenger seat. Perry was in the driver's seat; Dixon and Redmon were in the back seat. Diana's arrival did not interrupt the conversation between the three men. She heard Redmon say, "Ott should be right on time." The three men talked about Ronald Roy and someone said, "Well, he's not going to talk. We're going to keep him quiet." When Diana asked what Roy had done, Redmon told her that Roy was a "snitch" (an informer).

While she was seated in Perry's car, Diana noticed a car drive into the parking lot of the Fireplug 6 and saw the driver alight from his vehicle. A few minutes later, she looked back toward the parking lot and noticed the same man standing behind a different car, talking to a second man. She observed the first man strike the other on the head but looked the other way before she was able to determine whether a weapon was used. When she looked back again, Diana did not see the person who had been struck, but she did observe the assailant close the trunk of the car behind which the two men had been standing, enter the car, start the motor, and drive the car into the street. Perry and his passengers followed in his car.

The two cars proceeded to the Carquinez Heights area and parked next to each other. Dixon, Redmon, and Perry got out of their car, and the man identified as Ott got out of the other automobile. The four men gathered behind the car driven by Ott and began talking. Dixon stood back from the others and said, "Let's hurry and get it over with. . . . I don't want to be a part of this thing." After responding to Dixon, Ott asked Perry to identify "the broad in the car." Perry replied that she was his "old lady." Ott approached Diana and said: "Well, look here, you haven't seen nothing here tonight. You never been here tonight. You don't know me, you never seen me." He also warned, "If you ever say

anything, I'll take care of you because this isn't my first time and it won't be my last."

Ott returned to the rear of the car he had driven and opened the trunk, inadvertently enabling Diana to see the head of a person who was in the trunk. Addressing that person, Ott screamed, "I just want you to know that we know[1] . . . You know why we are doing this." Diana thought that the person in the trunk was going to be beaten so she lay down on the front seat of Perry's car, presumably to avoid seeing the violence. The person in the trunk began crying and pleading. Three shots were fired, and the suppliant's voice was heard no more. Diana sat up and saw Ott closing the trunk of the other car; she also noticed Perry give a gun to Redmon. Ott told Dixon to drive the car containing the body, and when Dixon protested, Ott replied, "Well, you have to do part of it." Perry and Redmon returned to Perry's car; Dixon and Ott entered the other vehicle. The two cars left the Carquinez Heights area and separated.

Perry, Redmon, and Diana drove to the house of Perry's mother. Diana waited in the car while the two men entered a trailer located on the property and changed clothes. The men returned to the car, drove a short distance down the road and burned the clothing they had just removed. Diana and the two men then drove back to the Fireplug 6. When they met Dixon in the parking lot (Ott was not present), Redmon handed a gun to Diana and told her to "get rid of it." She crossed some railroad tracks near the Fireplug 6 and threw the gun into a canal.[2] Shortly thereafter Perry drove her to her parents' house.

On cross-examination, Diana stated that she had never seen Roy prior to the night of the killing and that, because of her distance from them, she was unable to identify the two men she had seen standing behind the car in the Fireplug 6 parking lot. For impeachment purposes, defense counsel elicited admissions from Diana that she had previously given several different accounts of the events on the night in question. Although some of these accounts or portions thereof tend to exonerate one or more defendants, it is not necessary to review the details of each of the several versions because the verdicts indicate that the jury rejected the exculpatory accounts.

Both defendants offered alibi defenses. Testifying on his own behalf, Redmon denied any knowledge of the killing and accounted for his

---

[1]On cross-examination, Diana admitted she did not know whether Ott used the singular "I know" or the plural "we know" when addressing the person in the trunk.

[2]Subsequently, the police attempted to find the gun but were unsuccessful.

activities on the night in question. Redmon's parents corroborated his testimony, and although Perry did not testify, two of his relatives testified that they were with him at the critical times.

### Sufficiency of the Corroborating Evidence as to Defendant Perry

■ Penal Code section 1111 provides in pertinent part that "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . ." At the close of the prosecution's case, the trial court ruled that Diana Moore was an accomplice as a matter of law.[3] Accordingly, the prosecution was required to produce evidence corroborating her testimony.

■ To corroborate the testimony of an accomplice, the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. (*People* v. *Luker* (1965) 63 Cal.2d 464, 469 [47 Cal. Rptr. 209, 407 P.2d 9].) ■ "The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." (*People* v. *Lyons* (1958) 50 Cal.2d 245, 257 [324 P.2d 556]; see also *People* v. *Luker, supra,* 63 Cal.2d 464, 469; *People* v. *Holford* (1965) 63 Cal.2d 74, 82 [45 Cal. Rptr. 167, 403 P.2d 423].) ■ "Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant." (*People* v. *Santo* (1954) 43 Cal.2d 319, 327 [273 P.2d 249].) "[T]he corroborative evidence may be slight and entitled to little consideration when standing alone." (*People* v. *Wade* (1959) 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116].)

■ With the above principles in mind, we must determine whether

---

[3]Since any possible error in ruling that Diana was an accomplice as a matter of law afforded defendants greater protection, we do not need to pass upon the correctness of the trial court's ruling. We shall assume without deciding that Diana was an accomplice as a matter of law.

sufficient evidence was introduced to corroborate the accomplice's inculpation of Perry. Sergeant Odiorne testified that on August 28, 1968, Diana Moore telephoned him and said that pursuant to a prior arrangement she was going to meet Perry. Thereafter, Odiorne and other officers followed Diana who was driving her father's car to the Montgomery Ward parking lot in Richmond. Perry could not be located but his automobile was parked in front of the store. Diana entered the establishment and talked with Darrel Walters, a friend of Perry, who told her that the latter had just left.[4] A short time later, Odiorne approached Walters and spoke with him. At the conclusion of the conversation, Walters gave Odiorne a set of keys to Perry's car and said that Perry had requested the keys be delivered to Diana so that she could drive the car to Vallejo. Although the keys were given to Diana before she and the officers left Richmond, she returned them to an officer who drove Perry's car to Vallejo while Odiorne and Diana followed in her car. En route to Vallejo, Diana told Odiorne that there were narcotics in Perry's car. Odiorne asked if he could search the car and Diana consented, advising him where the narcotics would be found. In Vallejo, the officers searched the car. They found ammunition and some narcotics paraphernalia in the trunk lid, a loaded gun in the tire well, and a substantial amount of narcotics and drugs under clothing in the trunk. An expert testified that the contraband would bring approximately $1,400 at "street prices."

On September 2d, Odiorne was at the house of Diana's parents when Diana received a telephone call from a person identifying himself as Perry.[5] At Diana's request, Odiorne picked up an extension phone and listened to the conversation. According to his police report and his testimony, the following conversation transpired:[6] " 'I'd like to see you, Diana.' 'I'd like to see you, too.' 'What's Odiorne looking for me for?' 'You know what Odiorne's looking for you for.' 'Is it about that Roy thing?' 'Yes, it is.' 'You know I didn't have anything to do with that.' 'Well, that's the way it is.' 'Well, did you get my stuff out of my car?' 'What stuff?' 'You know what stuff I mean.' 'You mean your stash?' 'Yes, that's right.

---

[4]At trial, Walters testified that Perry "took off running" when Diana drove into the parking lot followed by two black-and-white police cars.

[5]On appeal, "[t]his court must view the evidence in a light most favorable to respondent and presume in support of the judgment every fact the trier could reasonably deduce from the evidence." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) Therefore, we shall presume that the person who identified himself as Perry was in fact Perry.

[6]Diana Moore gave an account of the conversation that differed in minor respects from the account provided by Odiorne. Since the differences are insubstantial and Diana's version cannot be used for purposes of corroboration, it is unnecessary to set forth her recollection of the conversation.

You know I have about $1000.00 worth of stuff there.' 'Yes, I know. That's why I am sitting on it.' 'I have to get that stuff, because you know I have to run, Diana.' 'I know.' " Perry mentioned a gun and said, "I can't be taken." Diana and Perry then discussed arrangements for a meeting.

On the following evening, Odiorne and other officers were observing Diana as she stood on the porch of a building in Vallejo. About 10:30 p.m., a man and a woman drove up. When the man approached Diana and identified himself as the person sent by Perry, he was arrested.[7] The woman, later identified as Deborah Bray, was apprehended as she tried to escape. On the basis of information obtained from Deborah Bray, the police went to an apartment in San Francisco to find Perry. After searching the apartment, they proceeded to the basement which was dark as the lights had been extinguished. There they found Perry hiding behind a door and placed him under arrest. Nothing was found on his person, but his identification and two homemade hypodermic syringes were discovered on top of and inside cracks in a high partition of the room.

In response to the corroborating evidence offered by the prosecution, Perry submitted the deposition of Calvin Elam, a bail bondsman in Vallejo. Elam stated therein that Perry got in touch with him in late August 1968 to find out whether Elam would post bail in connection with a nonsupport warrant Perry thought had been issued for him. According to Elam, "he [Perry] wanted to know if the police were looking for him. So he wanted me to surrender him and get him out." By calling the police department and the sheriff's office, Elam determined that there were no outstanding warrants for Perry's arrest.

We must decide whether the above evidence adequately corroborates the testimony given by accomplice Diana Moore. ■ The law is settled that "[e]vidence of flight supports an inference of consciousness of guilt and constitutes an implied admission." (*People* v. *Brooks* (1966) 64 Cal. 2d 130, 138 [48 Cal.Rptr. 879, 410 P.2d 383].) Flight tends to connect an accused with the commission of an offense and may indicate that an accomplice's testimony is truthful. (See *People* v. *Santo, supra,* 43 Cal.2d 319, 330; *People* v. *Hoyt* (1942) 20 Cal.2d 306, 312 [125 P.2d 29]; Anderson, Wharton's Criminal Evidence, § 464 at pp. 252-254.) As such, the flight of one who knows he is suspected of committing a crime may be sufficient to corroborate the testimony of an accomplice. (*People*

---

[7]At trial, the man testified that he had met Perry in San Francisco and that Perry had asked him to drive to Vallejo to meet Diana. Perry said that Diana would have a .45 automatic, narcotics, and some of Perry's clothing. This testimony was corroborated by another witness.

v. *Santo, supra,* 43 Cal.2d 319, 330.) ■ Likewise, attempts of an accused to conceal his identity (see *People* v. *Waller* (1939) 14 Cal.2d 693, 702 [96 P.2d 344]) or his whereabouts (see *People* v. *Winthrop* (1897) 118 Cal. 85, 91 [50 P. 390]) may warrant an inference of consciousness of guilt and may corroborate an accomplice's testimony *(People* v. *White* (1941) 48 Cal.App.2d 90, 95 [119 P.2d 383]).

■ At trial, Perry argued that the corroborating evidence was insufficient for two reasons. First, he maintained that there was not enough evidence from which a jury could conclude that he was fleeing or attempting to flee from the area. Testing the sufficiency of the evidence to show flight and concealment, we note the testimony of Walters that Perry "took off running" when two police cars followed Diana into the Montgomery Ward parking lot where defendant had planned to meet her. Also, in the September telephone conversation with Diana, Perry acknowledged that Sergeant Odiorne was looking for him in connection with the Roy killing and then said, "I have to get that stuff, because you know I have to run, Diana." The evidence indicates that subsequently Perry did try to get his "stuff"; in fact, he arranged to secure clothing, a gun, and the supply of narcotics under circumstances which suggest a desire for secrecy. Furthermore, when the police finally located defendant, they found him standing behind the closed door of a darkened basement. His identification was not on his person but had been placed on top of a wall partition where it was unlikely to be found. Thus, the record contains adequate evidence from which a jury could reasonably find that Perry was attempting to flee and to conceal his identity and whereabouts.

Second, defendant contended that the corroborating evidence was insufficient because there were several explanations for his flight other than consciousness of guilt of the Roy killing. Defendant asserted that he may have been fleeing because he thought a nonsupport warrant for his arrest was outstanding, because he feared arrest for the narcotics hidden in the trunk of his car, or because he knew he had violated his parole. This court has considered and rejected similar contentions on the theory that it is the jury's function to determine which of several possible reasons actually explains why a defendant fled.

In *People* v. *Armstrong* (1896) 114 Cal. 570 [46 P. 611], the defendant was convicted of stealing a horse. The principal witness against the defendant was an accomplice whose testimony was corroborated by evidence showing that the three persons allegedly involved in the theft surreptitiously fled from the vicinity of the larceny, that a bridle stolen with the horse was found in the defendant's possession, and that the defend-

ant expressed astonishment at being overtaken by the authorities. Regarding the evidence which indicated flight, this court said: "True, there was evidence to show that before the theft of the horse the defendant was, as he put it, 'taking precautions to avoid running into an officer,' being apprehensive of arrest for some breach of the peace, and his flight might have been ascribed to such apprehension; but this was a circumstance for the jury; they were not bound to attribute the consciousness of guilt indicated by flight to one disposing cause rather than the other." (At p. 574.)

The same legal issue was presented in *People* v. *Santo, supra,* 43 Cal.2d 319 where the defendants were convicted of first degree murder, principally on the basis of an accomplice's testimony. To corroborate the accomplice's testimony as it pertained to two of the defendants, the prosecution relied upon the testimony of a nonaccomplice which tended to show that the three defendants had associated for the purpose of going to Mrs. Monahan's house on the night of her death and committing some crime. In addition, the prosecution introduced evidence showing that the defendants left their respective homes and moved to a motel one month after the murder and that they moved twice more before their arrest the following month.

In *Santo,* the defendants contended that the evidence of their three changes of residence was insufficient for purposes of corroboration because their frequent movement was " 'upon the instigation and advice of an attorney upon whom they had every legal right to rely.' " (At p. 330.) The defendants further argued that their conduct " 'may reveal some anxiety under the reported disappearance of Baxter Shorter [an accomplice who was known to have cooperated with the police], but nowhere does it show flight, concealment or consciousness of guilt in connection with the alleged murder of Mabel Monahan.' " (*Id.*) Rejecting these arguments, this court stated: "It is true that the evidence of the conduct of defendants between the time of the slaying and the time of the arrest does not specifically and directly evidence consciousness of guilt of the killing of Mrs. Monahan, any more than it evidences consciousness of guilt of the reported kidnapping of Shorter or consciousness of guilt of preparation for a 'guano deal' [a business transaction which ostensibly was to take place at the first motel]. It was for the jury to determine the weight, if any, against defendants of such evidence. They could view the conduct of defendants as evidence of flight." (*Id.*)

██ As established by *People* v. *Armstrong, supra,* 114 Cal. 570 and *People* v. *Santo, supra,* 43 Cal.2d 319, the existence of explanations—other than consciousness of guilt of the crime charged—for conduct which

may be interpreted as flight is relevant to the *weight* of the evidence showing flight, but *not* to its admissibility or sufficiency for the purposes of corroboration. ■ Unless a reviewing court determines that the corroborating evidence should not have been admitted or that it could not reasonably *tend* to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal.[8] (*People* v. *Todd* (1959) 175 Cal.App.2d. 508, 523 [346 P.2d 529].)

■ In the instant case, there is sufficient evidence from which a jury could reasonably infer that Perry's attempted flight and concealment were connected with Roy's death. Contrary to arguments presented by defendant at trial, Sergeant Odiorne's testimony concerning the telephone conversation of September 2 tends to show that defendant knew, prior to his flight from the police in Richmond, that he was being sought for the Roy killing. According to the officer's report, the conversation contained the following dialogue between defendant and Diana: " 'What's Odiorne looking for me for?' 'You know what Odiorne's looking for you for.' 'Is it about that Roy thing?' 'Yes, it is.' "

Furthermore, under the rule that an appellate court must view the evidence in a light most favorable to the verdict (see *People* v. *Redmond, supra,* 71 Cal.2d 745, 755), we must uphold the trial court's disposition if, on the basis of the evidence presented, the jury's determination is reasonable. In the instant case, we conclude that the inference drawn by the jury was reasonable. Examination of the possible explanations for Perry's flight reveals that, more likely than not, he was attempting to escape apprehension for the commission of the crime for which he now stands convicted. First, according to the bail bondsman's testimony, Perry knew there was no nonsupport warrant issued for his arrest, and even were such a warrant outstanding, Perry indicated his willingness to surrender on that charge. Also, Perry's efforts to obtain a weapon would permit the jury to infer that he was attempting to avoid capture on a charge more serious than nonsupport. This is reinforced by his statement to Diana in the telephone conversation when the gun was mentioned: "I can't be taken." Second, Perry's fear of being arrested for possession of narcotics could not have motivated his behavior because there is nothing in the evidence to indicate that he had knowledge that the police had discovered his contraband; in fact, Diana had assured him that she possessed his "stash" of narcotics and was "sitting on it." The final alter-

---

[8]To the extent *People* v. *Ciani* (1930) 104 Cal.App. 596 [286 P. 459] is inconsistent with the views expressed herein, that case is disapproved.

nate explanation for Perry's flight is that he thought the police sought him for parole violation, but as he did not testify, the jury was never informed of any possible reasons why Perry feared his parole might be revoked if indeed he was on parole. The unlikely possibility that Perry fled because of a parole violation unrelated to the present charges would not preclude the jury from finding that Perry's conduct was connected with Roy's death.[9] Thus, the evidence introduced to corroborate the testimony of accomplice Diana Moore reasonably tended to connect defendant's flight with the homicide, and we cannot disturb the implicit finding of the trier of fact on that issue.

Although it has been suggested that *People* v. *Robinson* (1964) 61 Cal.2d 373 [38 Cal.Rptr. 890, 392 P.2d 970] is controlling, that case is factually distinguishable from the one before us. The defendant in *Robinson,* who was subsequently convicted of first degree murder, voluntarily surrendered himself to the police and gave them two statements concerning his activities on the weekend when the crime occurred. A prosecution witness who was called upon to specify an alleged conflict in the defendant's statement "was able to point to but one conflict in the repetition of a narrative covering [the defendant's] movements for three days . . . ." (At p. 400.) While conceding that the making of conflicting or inconsistent statements may, in proper circumstances, indicate a guilty state of mind, the court concluded that a jury could not *reasonably* infer that the defendant's differing statements were made for the purpose of concealing his connection with the crime charged. (*Id.* at pp. 400-401.)

The present case differs from *Robinson.* When Perry learned that he was being sought by the police, rather than surrender himself as did the defendant in *Robinson,* Perry attempted to elude the police.[10] Moreover, the evidence here is such that a jury could reasonably connect Perry's attempted flight with the crime for which the accomplice's testimony incriminates him. Hence, any reliance on *People* v. *Robinson, supra,* 61 Cal.2d 373 is misplaced.

To summarize, in light of the above authorities—most notably *People* v. *Santo, supra,* 43 Cal.2d 319, *People* v. *Hoyt, supra,* 20 Cal.2d 306, and *People* v. *Armstrong, supra,* 114 Cal. 570—we conclude that the evidence

---

[9] Perry's statement in the phone conversation that he "didn't have anything to do with" Roy's death was evidence for the jury's consideration. Introduction of that statement does not, as a matter of law, preclude a jury finding that Perry was fleeing to avoid capture for killing Roy.

[10] In *Robinson,* the court distinguished *People* v. *Santo, supra,* 43 Cal.2d 319 in part on the ground that the defendants in *Santo* fled after they learned they were suspected of murder.

of Perry's attempted flight and concealment is sufficient to support an inference of consciousness of guilt for the killing of Roy, and that therefore this evidence is legally sufficient to corroborate the testimony of accomplice Diana Moore.

### Legality of the Search of Perry's Automobile and Seizure of Weapon and Contraband

■ Perry contends that the gun, ammunition, drugs, narcotics, and narcotics paraphernalia taken from his automobile should have been suppressed as the product of an illegal search and seizure. In response, the People argue that the objection to admission of the evidence seized from Perry's vehicle was not timely and that, in any event, the search was proper because the police had probable cause to search, because the vehicle was being used in an escape attempt and because Diana Moore consented to the search. Perry counters that the police did not have probable cause to search, that the vehicle was not being used in an escape and that Diana's consent to the search was vitiated by her involvement with the police. It is unnecessary to resolve these conflicting contentions because any possible error in admitting the contested evidence was harmless beyond a reasonable doubt. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

The *Chapman* rule "requires reversal if, upon an examination of the entire record, it appears reasonably possible that the error might have materially influenced the jury in arriving at its verdict, and the error must be considered harmless if the likelihood of material influence is not within the realm of reasonable possibility." (*People* v. *Coffey* (1967) 67 Cal.2d 204, 219-220 [60 Cal.Rptr. 457, 430 P.2d 15].)

In the instant case, the contraband seized from Perry's vehicle was introduced to show flight upon which the People rely as tending to demonstrate consciousness of guilt. (See *People* v. *Brooks, supra,* 64 Cal.2d 130, 138.) Other properly admitted evidence is uncontradicted as to Perry's belief that his car contained a gun plus a salable quantity of drugs and narcotics. In the telephone conversation of September 2d, he asked Diana whether his "$1000 worth of stuff" was still in his car. After he received an affirmative answer, he said, "I have to get that stuff, because you know I have to run, Diana." Perry talked about the gun he believed was in the trunk and added, "I can't be taken." The evidence is also uncontradicted that Perry sent two people to meet Diana in Vallejo to retrieve his contraband from her. Since other evidence overwhelmingly proves that Perry attempted to flee, the challenged evidence was, as Perry concedes, merely cumulative

on that issue. Additionally, since the immediate problem before the jury was one of determining Perry's state of mind, the jury needed to consider only Perry's words and actions to decide whether they revealed a consciousness of guilt; it was unimportant that the police actually found contraband in the vehicle. Accordingly, we are compelled to conclude that even had the trial court excluded the evidence which is now challenged, the jury would have reached the same verdict.

Furthermore, because of the context in which the challenged evidence was offered, it was not likely to have tainted the jury's deliberations. The only possible way the contested evidence could have predisposed the jury against Perry was by associating him with drugs, narcotics and weapons. This connection had already been made by evidence properly admitted on the issue of flight. In addition to evidence of the conversation with Diana and the directions given the two people who were sent to meet Diana in Vallejo, both the defense and the prosecution elicited substantial testimony indicating that Perry had supplied Diana with all types of drugs. Hence, the possibility that the challenged evidence prejudiced the jury is negligible, and any possible error committed by admitting that evidence was harmless beyond a reasonable doubt.

### Sufficiency of the Corroborating Evidence as to Defendant Redmon

The prosecution introduced the evidence as hereinafter set forth to corroborate Diana's testimony as it pertained to Redmon. Larry Linton, a convicted forger, testified that he was an inmate at the Solano County jail where Redmon had been confined prior to trial. On or about October 13, 1968, Redmon and another inmate named Billy Underwood entered Linton's cell. Linton was asked if he had thought about the possibility of escape. There was substantial conversation about the manner by which an escape could be accomplished, and Redmon showed Linton one or two places where the bars in the latter's cell had been cut. Underwood or Redmon also showed Linton an outside window through which a small person could crawl. Redmon said that "arrangements had been made for some hacksaw blades to come up." Redmon appeared to be interested in Linton because Linton might have "money or connections on the outside." Several days later, Redmon and a fourth inmate came to Linton's cell and talked more about escape.

On cross-examination, Linton further testified that Redmon showed him a door into the corridor of the jail which could be "jimmied" with a spoon. Linton told a deputy jailer that "something was going on upstairs" and showed the jailer a possible escape route pointed out by Redmon. Linton

did *not* tell the jailer that Redmon was going to attempt an escape. Although Linton conceded at trial that Redmon never expressed a definite intent or plan to escape, Linton quoted Redmon as saying that he wanted to escape because "it wouldn't hurt him one way or the other."

Two days after Redmon and Linton first discussed escape, two teenage girls were apprehended as they tried to smuggle a hacksaw blade through a window in the jail. Their attempt took place near the cell of inmate Underwood but some distance from the cell of Redmon.

Testifying on his own behalf, Redmon stated that he never talked to Underwood or Linton about escape and that he did not know anything about the attempt to smuggle a hacksaw blade into the jail. In support, Underwood testified that he had asked a friend to get him a hacksaw blade and that the same was not intended for Redmon. He also testified that he had never discussed the matter of escape with Linton or Redmon. One of the girls who was caught trying to smuggle the blade testified that she did not know Redmon and that she attempted to deliver the blade to Underwood. Finally, the defense called the deputy jailer who testified that Linton did not tell him Redmon was planning to escape. Linton did inform the jailer, however, that "trouble was brewing upstairs" involving Redmon, Underwood, and the fourth inmate brought to Linton's cell by Redmon.

 Evidence that a defendant was planning an escape, like evidence of flight, tends to demonstrate a consciousness of guilt (*People* v. *Burwell* (1955) 44 Cal.2d 16, 34 [279 P.2d 744]), regardless of whether the escape was actually attempted (*People* v. *Schafer* (1911) 161 Cal. 573, 579 [119 P. 920]). As such, evidence of a planned escape may be sufficient to corroborate the testimony of an accomplice. In the present case, the jury implicitly found that Redmon was planning an escape and that the consciousness of guilt thereby demonstrated was sufficient to corroborate the incriminating testimony of accomplice Diana Moore. These conclusions are reasonable and will not be disturbed on appeal. (See *People* v. *Redmond, supra,* 71 Cal.2d 745, 755.)

Redmon presents several arguments why the evidence is insufficient to corroborate the accomplice's testimony as it relates to him. First, defendant contends that the cases dealing with escape as a factor revealing consciousness of guilt are factually distinguishable because the evidence in the instant case indicates only that there might have been "general conversations about the desirability and means of escape." We disagree. Larry Linton testified that he was present when Redmon and Underwood discussed methods of escape; Underwood testified that he was planning an escape. Although there was testimony that the hacksaw blade intercepted

by the jail guards was not intended for Redmon, the jury was not bound to accept this testimony. Presented with the total evidence, a jury could reasonably conclude that Redmon was involved in more than "general conversations about the desirability and means of escape."

Moreover, we reject Redmon's argument that *Burwell, supra,* 44 Cal.2d 16 and *Schafer, supra,* 161 Cal. 573 are distinguishable because the record here contains no evidence that he escaped, actually attempted to escape, or possessed the tools for escape. In *Schafer,* a letter written by the defendant in which he discussed a possible escape was admitted to show consciousness of guilt. Upholding the sufficiency of this letter to establish consciousness of guilt, this court noted, "[T]he fact that appellant was not furnished [with the requested means of escape] and therefore he made no attempt to carry his purpose into execution does not affect the question." (*Id.* at p. 579.)

Secondly, defendant maintains that our decision in *People* v. *Ellis* (1966) 65 Cal.2d 529 [55 Cal.Rptr. 385, 421 P.2d 393] "destroyed the reasoning" behind the rule that an escape or attempted escape from custody tends to demonstrate consciousness of guilt. In *Ellis,* we stated that an accused's refusal to take a voice identification test might indicate a consciousness of guilt. However, on the facts of that case, we held that evidence of the defendant's refusal was inadmissible because the police had warned the defendant of his right to remain silent but had failed to advise him that the right to remain silent does not include the right to refuse participation in a voice test. (*Id.* at p. 539.)

Furthermore, this court has recently reaffirmed the principle that escape may be probative of a consciousness of guilt. (*People* v. *Terry* (1970) 2 Cal.3d 362, 395 [85 Cal.Rptr. 409, 466 P.2d 961].) In an argument similar to one raised by Redmon at the trial level, Terry contended that evidence of his escape was inadmissible because "it is likely that one who has been incarcerated several months escapes because he cannot bear further incarceration." (*Id.*) Rejecting this contention, we stated: "This is possible, but it is also probable that only one who expects his guilt to be proved at trial will attempt an escape and that an innocent man will stay for trial in order to clear his name and win lawful liberty." (*Id.*; fn. omitted.) The existence of alternate explanations for the defendant's conduct goes to the weight, not the admissibility of the evidence. (See *Id.*)[11]

---

[11]In passing, we note that *Terry* also disposes of defendant's contention that the trial judge erred in refusing to exclude evidence concerning escape. Under Evidence Code section 352, the judge may exclude evidence if he thinks that "its probative value is substantially outweighed by the probability that its admission will . . .

Thirdly, Redmon contends that the corroborating evidence is inadequate because it fails to connect him "with the crime without any aid from the testimony of the accomplice." (See *People* v. *Luker, supra,* 63 Cal.2d 464, 469.) Apart from the testimony of the accomplice, the record contains testimony establishing that defendant was in jail awaiting trial for the murder of Roy when he made plans for escape. The jury could reasonably find that these escape plans were motivated by fear of conviction for the Roy killing. Accordingly, we conclude that the evidence concerning the plan to escape adequately corroborates accomplice Diana Moore's testimony as to defendant Redmon.

### Evidence of Other Crimes

Both defendants contend that evidence of other crimes and wrongful acts was improperly admitted. Evidence Code section 1101, subdivision (b), provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than his disposition to commit such acts." ▮ Although evidence establishing the commission of another crime may be relevant to prove some fact other than a defendant's criminal disposition, such evidence is admissible only if its probative value in relation to the fact in question outweighs its prejudicial effect. (*People* v. *Schader* (1969) 71 Cal.2d 761, 774 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Sam* (1969) 71 Cal.2d 194, 206 [77 Cal.Rptr. 804, 454 P.2d 700].) ▮ "Before permitting the jury to hear evidence of other offenses the court must ascertain that the evidence (a) 'tends logically, naturally and by reasonable inference' to prove the issue upon which it is offered; (b) is offered upon an issue which will ultimately prove to be material to the People's case; and (c) is not merely cumulative with respect to other evidence which the People may use to prove the same issue." (*People* v. *Schader, supra,* at p. 775; fns. omitted.)

▮ Perry asserts that the trial court should have excluded all references to a revolver, drugs, and narcotics because such references were irrelevant, remote, cumulative, and prejudicial. In general, the evidence was admissible to show flight and the motivation therefor. Evidence that a suspect who knows he is sought by the police tells a friend "I can't be taken," tries to obtain a gun and attempts to flee indicates that he is motivated by fear of apprehension for a serious crime, one of more consequence than the nonsupport charge Perry claims motivated his flight.

create substantial danger of undue prejudice. . . ." Admission of evidence concerning escape was proper in the present case in view of its relevance as corroboration of the accomplice's testimony.

Likewise, evidence concerning the clandestine attempt to obtain a substantial quantity of salable drugs and narcotics tends to establish an intention to effect a permanent relocation. Finally, by failing to object at trial, Perry waived any objection he might have made to testimony that he had supplied drugs to Diana. The trial court did not abuse its discretion in receiving this evidence, and any possible error in admitting the contraband itself was harmless. (See *ante*, p. 777.)

Defendant Redmon also complains that evidence of other crimes and wrongful conduct was improperly received as part of the testimony relating to his plan to escape from jail. Since this evidence was necessary to corroborate the accomplice's testimony, the trial court acted within its discretion in admitting such evidence.

Redmon further claims that the trial court should have excluded evidence which showed that he kept a loaded shotgun under the front seat of his automobile and that he had shot himself shortly before his arrest for the Roy murder. This evidence was elicited under cross-examination of Redmon and was used to impeach his testimony on direct examination that he had never seen anyone shot. Our examination of the record reveals no objection to this testimony.

Finally, Redmon contends that the court erred in refusing to strike his testimony on cross-examination concerning narcotics. After Redmon admitted that he had possessed narcotics, his counsel objected to the line of questioning and moved to strike the testimony. The court granted the objection but denied the motion to strike. When the nature of a question indicates that the evidence sought is inadmissible, there must be an objection to the question; a subsequent motion to strike is not sufficient. (*People* v. *Scalamiero* (1904) 143 Cal. 343, 345 [76 P. 1098]; Witkin, Cal. Evidence (2d ed. 1966) § 1297, p. 1200.) "A party cannot hazard whether the reply of a witness to an objectionable question will be favorable or unfavorable to him, and when it appears unfavorable then object to it. He must object when the question is asked and before the answer is given, and if he does not, he waives his right to complain of the admission of the testimony under the answer." (*People* v. *Scalamiero, supra*, 143 Cal. at p. 345.) In the present case, the question asked by the prosecutor was such that the answer from defendant would necessarily contain inadmissible evidence, but defense counsel did not object until defendant gave an unfavorable response. The trial court did not err in denying defendant's motion to strike.

## Waiver By Diana of Psychotherapist Privilege

■ At trial, counsel for defendant Perry requested permission to review the records of the Solano County Mental Health Department pertaining to treatment of Diana by psychotherapists. Counsel for the mental health department contended that the records were privileged under Evidence Code section 1014[12] and asserted the privilege on Diana's behalf.[13] The court sustained the claim of privilege and refused to examine the records or to allow counsel for defendant to examine them. Perry assigns this ruling as error on the grounds that no privilege existed because the psychotherapists had been appointed by the court to examine Diana and that, even if the privilege existed, Diana had waived it.

The psychotherapist privilege does not apply if the court appoints the psychotherapist to examine the patient. (Evid. Code, § 1017.) Diana testified that a probation officer had directed her to go to a psychiatrist at the Family Counselling Service in Vallejo. Nothing in the record indicates that a judge had ordered her to see this psychiatrist or that her purpose in seeing him was examination rather than treatment. Although a court had ordered Diana to be examined by a psychiatrist for possible commitment to the California Rehabilitation Center, the records sought by Perry do not pertain to that examination. Also, when the privilege was claimed in the trial court, Perry did not claim that no privilege existed. Perry cannot raise that claim for the first time on appeal.

Concerning defendant's assertion that Diana waived the privilege, we note that Evidence Code section 912 provides that a privilege is waived "if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating his consent to the disclosure, including his failure to claim the privilege in any proceeding in which he has the legal standing and opportunity to claim the privilege."

In the trial court, Perry's counsel argued that Diana waived her psychotherapist privilege by giving certain testimony on cross-examination.[14] We

---

[12]Evidence Code section 1014 provides in pertinent part that "the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist if the privilege is claimed by: . . . (c) the person who was the psychotherapist at the time of the confidential communication . . . ."

[13]Evidence Code section 1015 provides: "The psychotherapist who received . . . a communication subject to the privilege under this article shall claim the privilege whenever he is present when the communication is sought to be disclosed and is authorized to claim the privilege under subdivision (c) of Section 1014."

[14]On appeal, Perry's counsel also refers to statements made by Diana to him in

have reviewed the statements Diana made at trial and are satisfied that she did not disclose a significant part of any communication with any psychotherapist. At most, her testimony disclosed that she had consulted two psychiatrists; she did not reveal the substance of her consultations. Mere admission that a psychotherapist-patient relationship exists does not disclose "a significant part of the communication." (See *In re Lifschutz* (1970) 2 Cal.3d 415, 430 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1].) Neither does the revelation that certain subjects were *not* discussed. (Cf. *People* v. *Hall* (1942) 55 Cal.App.2d 343, 356-357 [130 P.2d 733].)

Contrary to Perry's further contention, the holder of a privilege need not expressly claim the privilege to avoid its waiver. Even without an express assertion, the privilege is preserved until the holder discloses a substantial part of the privileged communication or until the holder remains silent in the face of a warning that disclosure of the privileged communication will be sought from other sources. (See Legislative Committee Comment to Evid. Code, § 912; *Lissak* v. *Crocker Estate Company* (1897) 119 Cal. 442, 445-446 [51 P. 688].)

### Special Finding or Special Verdict

Perry contends that the trial court's refusal to instruct the jury to return a special finding of fact or a special verdict was improper.[15] In contrast to the rules governing civil actions,[16] there is no statute which

September 1968 to demonstrate that Diana had waived her privilege. Since we have not been informed of the content of those statements and, more importantly, since those statements were not before the trial court when it ruled on the claim of privilege, we cannot consider them in determining whether the court improperly sustained that claim.

[15]Counsel requested the court to instruct the jury as follows: "You are instructed that before you deliberate or consider the issue of the guilt or innocence of the defendants, that you first answer the question propounded below, and in answering the question you are to do the following:

"1: If one or more of the jurors answers the question YES, then in that event your foreman is to mark the answer YES with an 'X'. The Foreman is to then sign the special finding where indicated. Your Foreman is then to retain this special finding until it is asked for by the Court. You are to then proceed with your deliberations as to the guilt or innocence of the defendants.

"2: If all twelve jurors determine that the answer to the question is No, then in that event your Foreman is to then make an 'X' by the answer 'No'. Your Foreman is to then sign this special finding where indicated; and then advise the bailiff of this finding.

"QUESTION: If all of the testimony of DIANA K. MOORE was removed from the record, does there then remain sufficient independent evidence, standing alone, to arise a question of fact of guilt of the defendants?

"ANSWER: YES____ No____"

[16]Code of Civil Procedure section 625 provides that a trial court may, in its discretion, request the jury to render special findings of fact. In the absence of a

authorizes the judge to submit special interrogatories to the jury in a criminal case.

Penal Code section 1150 does provide that a jury may, when it is in doubt as to the legal effect of the facts proved, return a special verdict. The verdict must present the jury's conclusions of fact and must be so presented "that nothing remains to the Court but to draw conclusions of law upon them." (Pen. Code, § 1152.) Under these provisions, defendant's special verdict form is defective in several respects. First, the form requires the jury to determine the sufficiency of the corroborating evidence before considering any other issues. Second, the form instructs the jury that it *must* return a special verdict. Third, the form requires the jury to reach a *legal* conclusion on the state of the evidence rather than a verdict based upon the facts. The trial court properly rejected defendant's requested jury instruction.

### Admissibility of Tape-Recorded Statements

During the trial, Perry's counsel requested permission to play to the jury a tape-recorded statement taken from Diana in September of 1968 in the office of the attorney for Perry. Counsel maintains that he sought introduction of the recorded statement in order to impeach Diana and to expose her demeanor while giving the statement. In proceedings outside the presence of the jury, the trial judge and all the attorneys listened to the first portion of the tape. The judge determined that too much of the tape was irrelevant and ineffective to impeach Diana's testimony, that the tape was too "mechanical," and that Perry's counsel was "virtually testifying" during a substantial portion of the tape. The court denied the request to play the entire tape but advised Perry's counsel that he could use those portions of the tape which were related to the subject matter of Diana's testimony. Counsel declined, stating that it was necessary to play the entire recording. On appeal, Perry has not challenged any of the trial judge's findings concerning the content or nature of the recording, and we are of the opinion that those findings provide a sufficient basis for denying Perry's request to play the entire tape. If, as the trial court determined, substantial portions of the tape were irrelevant for the purpose of impeachment, they do not become relevant because they demonstrate Diana's demeanor in giving them.

In any event, the record indicates that counsel for defendants read to the jury from a transcription of the recording. They used many of the

clear abuse of discretion, the trial court's determination is not subject to appellate review. (*Cembrook* v. *Sterling Drug Inc.* (1964) 231 Cal.App.2d 52, 63-64 [41 Cal.Rptr. 492].)

statements contained in the recording to cross-examine Diana, and therefore any conceivable error in refusing to admit the entire recording would have been harmless.

### Sufficiency of the Evidence as to Redmon's Guilt

 Redmon contends that the evidence is insufficient to support the judgment of conviction for first degree murder. He argues that Diana's testimony merely establishes that he was present when the murder occurred and that he thereafter handed her a gun with instructions to dispose of it.

Our function on appeal is not to reweigh or reinterpret the evidence but simply to determine whether there is sufficient evidence in the record to warrant the inference of guilt drawn by the trier of fact.[17] (*People* v. *Bradford* (1969) 70 Cal.2d 333, 341 [74 Cal.Rptr. 726, 450 P.2d 46]; *People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].) Diana testified that Redmon said he intended to keep a "snitch" from talking; that Redmon joined Perry, Dixon, and Ott at the trunk of the Roy car at the time of the killing; and that after the shooting Redmon delivered the gun to Diana with instructions to dispose of it. This evidence shows that Redmon was a participant in a plan to murder Roy and that he either committed the crime or aided and abetted its commission. We conclude that the evidence is sufficient to support the judgment.

### Voir Dire of Prospective Jurors

 Redmon contends that the trial court erred in not having the veniremen examined individually, outside each other's presence. He maintains that such a procedure is mandatory in a possible capital case[18] since prospective jurors who are questioned together can easily determine what answers will or will not cause them to be selected as jurors and will respond according to their willingness to participate in the trial. Redmon's counsel raised this matter "as a question, not as a request." The trial judge advised counsel that if he wanted to have the prospective jurors examined individually, he would have to furnish the court with authority supporting use

---

[17]Redmon relies upon *People* v. *Hall* (1964) 62 Cal.2d 104, 110 [41 Cal.Rptr. 284, 396 P.2d 700], where we stated: " 'Implicit in our duty to determine the legal sufficiency of evidence to sustain a verdict is our obligation, in a proper case, to appraise the sufficiency and effect of admitted or otherwise indubitably established facts as precluding or overcoming, as a matter of law, inconsistent inferences sought to be derived from weak and inconclusive sources.' " Defendant cites no established facts which would, as a matter of law, preclude or overcome an inference that he participated in the crime of premeditated murder.

[18]Redmon filed his brief before we held capital punishment to be unconstitutional in *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].

of that method. From our examination of the record, it appears that the matter was never raised again. Since counsel did not actually request the trial court to follow the suggested procedure or ask the court for a ruling on the subject, we do not reach the merits of defendant's argument on appeal.

### Testimony of Larry Linton

At trial, the testimony of Larry Linton was taken outside the presence of the jury and then read to the jury. Redmon contends that use of this procedure deprived him of his Sixth Amendment right to confront and contemporaneously cross-examine witnesses in the jury's presence. (See *California* v. *Green* (1970) 399 U.S. 149, 157-158 [26 L.Ed.2d 489, 496-497, 90 S.Ct. 1930]; *Barber* v. *Page* (1968) 390 U.S. 719, 725 [20 L.Ed.2d 255, 260, 88 S.Ct. 1318].)

The trial court employed the challenged procedure in order to prevent the jury from hearing about an admission made by Redmon to Linton which inculpated Redmon's codefendants.[19] (See *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].) Based on its assessment of Linton's intelligence and demeanor, the court determined that, irrespective of admonitory instructions, Linton might refer to this inadmissible and highly prejudicial admission. The court concluded that this danger outweighed the advantages of contemporaneous examination before the jury and ruled that Linton should testify outside the jury's presence.

The record indicates that Redmon's counsel initially objected to this procedure, primarily because he believed that cross-examination outside the jury's presence would be inadequate. When counsel requested permission to cross-examine Linton before the jury, the court advised counsel of the danger. The court warned that any testimony concerning Redmon's alleged admission could not be stricken and informed counsel of the possible prejudice to Redmon's codefendants. Counsel withdrew his request and stated: "We are agreed, your Honor. The defendant understands and consents." Given this concession, we conclude that Redmon waived any right he might have had to cross-examine Linton in front of the jury.

### Refusal to Admit Several Complete Pages
### of a Transcribed Statement

On cross-examination of the defense investigator who took a statement from Diana, the prosecutor asked the investigator whether he

---

[19]Redmon allegedly told Linton, "All three put a bullet in him." Had Redmon been tried separately, this damaging admission would have been admissible.

had given Diana a "trick" question. The investigator replied in the negative, and the prosecutor introduced a question from the statement which concerned Diana's relationship with Sergeant Odiorne. Objecting that the question was taken out of context, Redmon's counsel requested that the three pages before and after the disputed question be read to the jury. The court denied the request but informed counsel that he could cover the subject on redirect examination. On redirect, Redmon's counsel asked the investigator to tell what questions he had posed to Diana on the subject of her relationship with Odiorne. The investigator started reading from the first page of the transcribed statement, and, after determining that the first few lines read were not relevant to the point at issue, the court directed the witness to eliminate extraneous matter from his answer. Redmon's counsel argued that the entire statement was admissible under section 356 of the Evidence Code and moved for admission of the entire statement. The court denied this motion, and Redmon assigns this denial as error.

Section 356 provides in pertinent part: "Where part of an act, declaration, conversation or writing is given in evidence by one party, the whole *on the same subject* may be inquired into by an adverse party . . . ." (Italics added.) However, this provision " 'is necessarily subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced.' " (*Witt* v. *Jackson* (1961) 57 Cal.2d 57, 67 [17 Cal.Rptr. 369, 366 P.2d 641];[20] Legislative Committee Comment to Evid. Code, § 356.) "The rule is not applied mechanically to permit the whole of a transaction to come in without regard to its competency or relevancy . . . ." (Witkin, Cal. Evidence, *supra,* § 320, p. 283.)

In the instant case, Redmon's counsel sought to introduce portions of the statement which were unrelated to the excerpt introduced by the prosecution during cross-examination. The record is devoid of any indication that counsel ever tried to introduce those portions of the statement which pertained to the "trick" question. We find no error in the trial court's ruling.

### Failure to Give Limiting Instruction

Redmon contends that the trial court erroneously failed to instruct the jury that evidence pertaining to the gun and narcotics discovered in Perry's car was admissible only against Perry and solely for the purpose

---

[20]Evidence Code section 356 supersedes and substantially restates former Code of Civil Procedure section 1854. (Legislative Committee Comment to Evid. Code, § 356.)

of establishing flight. Evidence Code section 355 provides: "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added.) Although Redmon maintains that his trial counsel requested a limiting instruction, he cites no portion of the record indicating that such a request was made (see Cal. Rules of Court, rule 15(a)), and our examination of the record does not reveal any such request.[21] We reject this assignment of error.

### Failure to Instruct on Second Degree Murder and Manslaughter

The court instructed the jury as follows: "Although there are two degrees of murder, the evidence in this case is such that either the defendant is innocent of the charge of murder or he is guilty of murder in the first degree." Redmon contends that this instruction was incorrect and that the court should have instructed on second degree murder and manslaughter.

The trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence, even though not requested to do so. (*People* v. *Hood* (1969) 1 Cal.3d 444, 449 [82 Cal. Rptr. 618, 462 P.2d 370].) The general principles of law governing a case are " 'those principles of law commonly or closely and openly connected with the facts of the case before the court.' " (*Id.*) In other words, the trial court must on its own motion instruct the jury on lesser included offenses for which there is sufficient evidence in the record to support a verdict finding the defendant guilty. (*Id.* at pp. 449-450.) Thus, the question here is whether there is sufficient evidence or indeed any evidence from which the jury could have found Redmon guilty of second degree murder or manslaughter.

The only evidence concerning the circumstances and method of killing is the testimony of Diana which establishes that the murder was deliberate and premeditated. Redmon's only defense was alibi, and he did not present any evidence on his state of mind. Under these facts, the distinction between first degree murder and the lesser included offenses is not a "principle of law . . . closely and openly connected with the case." If the jury was convinced by the prosecution's evidence beyond a reasonable doubt it could come to only one conclusion—that the murder of Roy occurred after premeditation and deliberation. Since there was no

---

[21]In passing we note that, pursuant to request, the court instructed the jury to consider the testimony of Larry Linton only against Redmon.

evidence which would have warranted a finding of second degree murder or manslaughter, the trial court properly did not instruct on those crimes.

### Prosecutorial Misconduct

█ Finally, Redmon contends that the prosecution's closing argument was essentially a personal attack on Redmon's counsel. Unfortunately, we must conclude that the prosecutor did commit misconduct during his rebuttal argument; however, we must note that the improper remarks were made in response to a highly inflammatory argument made by Redmon's counsel. Although the remarks of a defense counsel do not justify retaliation by the prosecution, such remarks must be considered in assessing the prejudicial effect of the prosecutorial misconduct.

A substantial portion of the defense's closing statement argued that prosecution of the three defendants was a "set-up" designed to clear police records of an unsolved murder. Redmon's attorney asserted that once the police and prosecution had Diana's version of the killing, they discarded all facts to the contrary—ignoring reason, justice, and morality in order to secure a conviction. Besides referring to Diana as "scum" and suggesting that the police had coached her into giving the incriminating testimony, Redmon's counsel misstated the reason for dismissing the charges against codefendant Dixon by declaring "we know she's wrong about him."[22]

In rebuttal, the prosecutor read from an opinion of Mr. Justice White of the United States Supreme Court which stated that, unlike the prosecutor whose only function is to expose the truth, defense attorneys will often cross-examine a prosecution witness and try to impeach him even if the witness is known to be telling the truth. The prosecutor questioned the sincerity of Redmon's counsel in challenging the sufficiency of Sergeant Odiorne's police report concerning the Roy killing, implying that Redmon's counsel would not have challenged the report had he still been working for the district attorney's office. Thereafter, the prosecutor disparaged the closing argument of Redmon's counsel and said that Redmon's counsel "gets lost in his own voice." Finally, the prosecutor accused Perry's counsel of unethical conduct and the defense investigator of trickery for their respective roles in securing statements from Diana which contradicted the account she told the police. In net effect, the prosecutor attacked the defense attorneys because, according to him, defense counsel were not ethically obligated to present the facts and so were free to obscure the truth and confuse the jury.

---

[22]In fact, the charges against Dixon were dropped because the prosecution failed to introduce evidence corroborating Diana's testimony insofar as it inculpated Dixon.

Although the People contend that the prosecutor's remarks were a necessary response to Redmon's closing argument, it was nevertheless misconduct to assert that Redmon's counsel was acting in bad faith in challenging the sufficiency of the police report. (See *People* v. *McCracken* (1952) 39 Cal.2d 336, 348-349 [246 P.2d 913]; *People* v. *Pantages* (1931) 212 Cal. 237, 245 [297 P. 890].) Likewise, the prosecutor committed misconduct by implying that counsel for Perry had improperly secured statements from Diana. Even if the accusations against Perry's counsel found some support in the record, the prosecution should not have made them. "The conviction of a defendant of the crime of which he is accused should rest not even slightly upon the dereliction (if any) of his counsel, but ordinarily should be grounded upon acts committed by the defendant . . . ." (*People* v. *Pantages, supra,* 212 Cal. 237, 244.)

The People argue that defendant cannot raise the claim of prosecutorial misconduct on appeal because there was no objection or assignment of error at trial. In *People* v. *Berryman* (1936) 6 Cal.2d 331, 337 [57 P.2d 136], this court stated that there are two exceptions to the general rule making an objection to alleged prosecutorial misconduct prerequisite to the reversal of a judgment or the granting of a new trial. "One is where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict . . . . The other exception is where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court." (At p. 337.)

Upon timely motion, the court could have admonished the prosecutor to abandon his line of argument; thus, the second exception does not apply. As to the first exception, the case at bar was closely balanced in that the only substantial evidence against defendants was the testimony of an accomplice who had been severely impeached. In determining whether the instant case falls within the first exception, we must inquire into whether the challenged statements are likely to have contributed materially to the verdict. (See *People* v. *Berryman, supra,* 6 Cal.2d 331, 337.)

We must examine the objectionable comments in the context in which they were made. The improper remarks were directed against opposing counsel, not against defendants themselves. (See *People* v. *Rickman* (1945) 67 Cal.App.2d 711, 714 [155 P.2d 374].) The statements came at the conclusion of a lengthy trial in which much evidence was introduced, and there is little likelihood that the jury was affected by the prosecutor's relatively brief remarks. Furthermore, the rebuttal argument was a response

to defense counsel's inflammatory attack upon the prosecution. It is probable that the jurors viewed the argument as mere polemic retaliation intended to rehabilitate the integrity of the maligned law · enforcement agencies and gave it little or no consideration. Finally, and perhaps most importantly, the judge instructed the jurors that they had to decide the case on the basis of the evidence received in court and that they could not consider statements of counsel as evidence. For these reasons, we conclude that the prosecutorial misconduct was not likely to have caused a miscarriage of justice, that the objection to the misconduct was not timely, and therefore that reversal of the judgment is not justified on this ground.

### Conclusion

Defendants have cited us to no reversible error, and we have found none. The judgment of conviction is affirmed as to both defendants.

McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.