Filed 9/15/15

**CERTIFIED FOR PARTIAL PUBLICATION\***

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E061050 |
| v. | (Super.Ct.No. SWF1301983) |
| ERIC SCOTT NELSON, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Mark Mandio, Judge.

Affirmed in part, reversed in part, and remanded for resentencing.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and

Appellant.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III, IV, V, and VI.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Eric A. Swenson, Lynne G. McGinnis and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Eric Scott Nelson was going through a contentious divorce. After his friend Laura Tatarzyn mentioned getting a hit man to kill her boyfriend, defendant started talking to her — seemingly seriously — about having the same hit man kill his wife. He said to Tatarzyn, "You should ask for a two-for-one deal." Tatarzyn told defendant's wife, who told the police.

Juan Anguiano, an undercover officer, contacted defendant and pretended to be the hit man. He asked, "[Y]ou have a job for me[,] right?" Defendant said, "Yes." They agreed to meet at a Walmart in two days. At Anguiano's request, defendant agreed to bring a photograph, an address, and $300. Meanwhile, however, defendant's girlfriend learned that he was planning to have his wife killed. She threatened to leave him if he went through with it, and he did not go to the meeting.

Nevertheless, defendant was arrested for solicitation of murder. While he was in jail, he phoned his wife, in violation of a restraining order. He also phoned his girlfriend and tried to talk her into recanting her statements incriminating him.

The charges against defendant and the outcome of those charges were as follows:

| Count | Charge | Statute | Outcome |
|---|---|---|---|
| 1 | Solicitation to commit murder | Pen. Code, § 653f, subd. (b) | Guilty verdict |
| 2 | Carrying a concealed, loaded, unregistered firearm | Pen. Code, § 25400, subds. (a)(2), (c)(6) | Guilty plea |
| 3 | Violating a restraining order | Pen. Code, § 273.6, subd. (a) | Guilty verdict |
| 4 | Dissuading a witness on August 29, 2013 | Pen. Code, § 136.1, subd. (a)(1) | Guilty verdict |
| 5 | Dissuading a witness on September 16, 2013 | Pen. Code, § 136.1, subd. (a)(1) | Hung jury; dismissed |

Defendant was sentenced to a total of eight years in prison, calculated as follows:
(1) On Count 1, the principal term, six years (the midterm); (2) on Count 2, two years (the midterm), to be served concurrently; (3) on Count 3, a misdemeanor, one year, to be served concurrently; and (4) on Count 4, two years (the midterm), to be served consecutively.

Defendant appeals.[1]  In the published portion of this opinion, we will hold that defendant could commit solicitation of murder by soliciting Tatarzyn to solicit an

---

[1]    Defendant has also filed a petition for writ of habeas corpus (case No. E062035).  We ordered the writ petition considered with this appeal for the purpose of determining whether an order to show cause should issue.  However, the two cases have not been consolidated.  Thus, we will rule on the petition by separate order.

unnamed hitman. In the unpublished portion of this opinion, we will hold that defendant's conviction for dissuading a witness must be reversed; otherwise, we find no prejudicial error. Accordingly, we will reverse in part and remand for resentencing.

I

FACTUAL BACKGROUND

Defendant and Jane Doe[2] were married in 1988. In January 2013, Doe told defendant that she was going to get a divorce. However, they continued to live in the same house. They had various disagreements about property division, spousal support, child support, and child custody. As a result, defendant was angry and "very unhappy."

In April 2013, defendant rented a house on his property to Laura Tatarzyn. They became friends. Defendant discussed his problems with his wife with Tatarzyn "[e]very day."

Meanwhile, Tatarzyn was having problems of her own with Edgar, the father of her child. In June 2013, her friend Yoshi said jokingly, "[You] could always go find somebody in T[ijuana] to go take care of it," meaning that she could hire someone to kill Edgar.

Tatarzyn told defendant about her conversation with Yoshi. Defendant seemed to find it funny. However, a week or two later, he asked her for Yoshi's phone number. He

---

[2] The trial court ordered that defendant's wife be referred to by this fictitious name. (See Pen. Code, § 293.5.)

4

explained that "he was having a really rough time with his wife . . . ." Tatarzyn claimed she did not have the number.

On July 12, 2013, defendant asked again for Yoshi's phone number. He said that he needed someone to "take care of" his wife, because he was desperate and there was no other way out. Tatarzyn said that she was going to Tijuana for other reasons, and while she was there, she would "take care of" Edgar. Defendant said, "You should ask for a two-for-one deal."

That same day, Tatarzyn contacted Doe. She told Doe that defendant had asked her for the phone number of a hit man and she was in fear for Doe's life. Later that day, Doe called the police. As a result, Investigator Robert Cornett interviewed Tatarzyn.

Meanwhile, Tatarzyn went to Tijuana to go to a party. While she was there, she texted defendant that she was buying "pig meat" from a "farmer" whom Yoshi knew for $1,000. She intended this to be "code" meaning that the hit man charged $1,000. She thought defendant would understand because he slaughtered pigs. When he did not seem to understand, however, she also texted, "I'm not talking about pigs. Think Scott. Why am I going to Tijuana?" He replied, "Yes I understand the menu now."

That night, when Tatarzyn got back, she talked to defendant about the supposed hit man in Tijuana. Unbeknownst to him, she recorded the conversation. The recording was admitted into evidence and played for the jury. Among other things, they said:

"TATARZYN: So I went to TJ.

"NELSON: How'd that go? [¶] . . . [¶] . . .

5

"TATARZYN: . . . So I told him that . . . you were interested.

"NELSON: Yeah.

"TATARZYN: So. The, the way it would be pretty nifty too.

"NELSON: Really?

"TATARZYN: Yeah. It's a barrel of they, they just, he just does it and then he puts it in a barrel with tar mixed with oil and so I guess the consist . . . the consistency is, it doesn't, cause when you go back across the border it doesn't, they don't scan. So you'd take it back across the border as like [p]etrol and then from there it's just, nobody cares. So apparently he's done like seventeen so far.

"NELSON: Shit.

"TATARZYN: So if you want, he said he'd come up here, he just needs like two or three days cause he's doing something else.

"NELSON: Yeah. [¶] . . . [¶] . . .

"TATARZYN: . . . I mean he'll be up here in a couple of days.

"NELSON: Yeah, [w]ell he's, think he's pretty clean and professional.

"TATARZYN: Yeah. It's [c]artel for you. They don't, they don't mess around.

"NELSON: Yeah, cause you wouldn't believe the shit that[']s . . .

"TATARZYN: What happened?

"NELSON: No, it's just constant. It gets worse and worse you know. It's just constant attacking me . . . . [¶] . . . [¶] . . .

6

"NELSON:  Blah, blah you're such an asshole.  You, you're never going to see the kids on Thanksgiving and it's just like _____.  It's just constant.

"TATARZYN:  But are you willing to go through with it the whole way, cause . . . ?

"NELSON:  Yeah, well how would I, I mean, I'll, will I have to be somewhere that I will have a witness or . . . ?

"TATARZYN:  Don't you work a job?

"NELSON:  Well.  Yeah I don't have a supervisor.  I'm with Jonathan but . . .

"TATARZYN:  All he needs he said is two hours.

"NELSON:  Hmm.  How could that be uh, hmm, two hours like he'd have, like he's want to come here, or?

"TATARZYN:  No, he just needs, I mean he'll talk to you.  I don't know the details, cause . . .

"NELSON:  Have to be worked out?

"TATARZYN:  Yeah, he'll have to talk to you.  [¶]  . . .  [¶]  . . .

"NELSON:  But yeah, so a thousand bucks?

"TATARZYN:  Thousand bucks."

Investigator Cornett arranged for Investigator Juan Anguiano, an undercover officer, to pretend to be a hit man from Tijuana.

On or about July 17, 2013, Tatarzyn gave defendant Anguiano's phone number.

7

On July 18, 2013, Tatarzyn asked defendant if he had used the phone number; he said "No, not yet."

On July 19, 2013, defendant told Tatarzyn that he needed to figure out how to call the phone number without being traced. She let him use her phone. He placed a call, but there was no answer. Tatarzyn texted Investigator Cornett and told him the call had not gone through.

About an hour later, Anguiano phoned Tatarzyn, and she handed her phone to defendant. A recording of the call was admitted into evidence and played for the jury. In it, there was this exchange:

"UC OFFICER: Ah, who do you wish to talk to . . . ?

"NELSON: Oh, [Tatarzyn] said there's somebody that ah, who you meet me and ah, discuss some things. Maybe get some tacos.

"UC OFFICER: Oh, I, you are, you, you have ah, you have a job for me right?

"NELSON: Yes."

Defendant and Anguiano agreed to meet on Sunday at noon at the Walmart in Murrieta. Anguiano requested a photograph and an address. Defendant said he understood and added, "No problem." Anguiano asked, "Um, you're going to give me three hundred . . . ?" Defendant said, "Okay."

On July 20, 2013, defendant told his girlfriend, Vivian Levinson, "I know someone that can get rid of my wife[.]" He said he had an appointment to meet the person the following day. She cried and "begged him not to do this." She added that "[i]f he was to

8

proceed with it, [she] couldn't be with him anymore." Defendant replied, "That's fine. . . . I'll take care of it and stop it."

The next day, July 21, 2013, early in the morning, Levinson heard defendant sending a text message. That same day, Tatarzyn received a text from defendant saying, "Gonna pass on Guido's services. Thank you[.]" Later, defendant told Levinson, "You saved someone's life today."

On July 22, 2013, defendant was arrested. An emergency protective order was issued and served on defendant prohibiting him from contacting Doe or his children. Nevertheless, defendant placed three calls to his home phone from jail.

Meanwhile, Investigator Cornett obtained a statement from Levinson.

On August 29, 2013, in a phone call from jail, defendant told Levinson to contact his criminal defense attorney who would "coach her on her statement." He claimed her statement was the only reason why he was still in jail. He said she should "make it right" by "reversing [her] statement."

On September 16, 2014, defendant sent Levinson a letter from jail saying, "I would be free this minute if they had not told you what to say." He added, "I don't . . . know who threatened you. I trust that you feared . . . ." He continued, "I am not judging you. . . . Please make right the statements made under duress."

II

THE SUFFICIENCY OF THE EVIDENCE OF SOLICITATION OF MURDER

Defendant contends that there was insufficient evidence of solicitation of murder.

With respect to solicitation of Tatarzyn, defendant argues that he only asked her to ask a hit man in Tijuana for "a two-for-one deal." Thus, he solicited her to solicit someone else to commit murder, which, he argues, is not a crime.

With respect to solicitation of Anguiano, defendant argues that it was Anguiano who solicited him, by saying, "[Y]ou have a job for me[,] right?"

We will hold that there was sufficient evidence that defendant solicited Tatarzyn. Thus, we need not decide whether there was sufficient evidence that he solicited Anguiano.

"'"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citation.]" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.)

"Every person who, with the intent that the crime be committed, solicits another to commit or join in the commission of murder" is guilty of solicitation of murder. (Pen. Code, § 653f, subd. (b).)

"The essence of criminal solicitation is an attempt to *induce another to commit* a criminal offense. [Citations.] [¶] Consistent with this conception, a defendant can ordinarily be convicted under a general solicitation statute only if, had the solicitation been successful, the person solicited would have been guilty of the underlying offense." (*People v. Herman* (2002) 97 Cal.App.4th 1369, 1381-1382, fn. omitted.)

A person can be guilty of a crime as a perpetrator or as an aider and abettor. (Pen. Code, § 31.) "An aider and abettor is one who acts 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 161.) Thus, a person who successfully solicits another person to commit a crime is equally guilty of that crime, as an aider and abettor. It follows that a person who solicits a second person to solicit a third person to commit a crime has essentially solicited the second person to commit the identical crime.

"In the usual solicitation case, it is the solicitor's intention that the criminal result be directly brought about by the person he has solicited; that is, it is his intention that the crime be committed and that the other commit it as a principal in the first degree, as where A asks B to kill C. However, it would seem sufficient that A requested B to get involved in the scheme to kill C in any way which would establish B's complicity in the

11

killing of C were that to occur.  Thus it would be criminal for one person to solicit another to in turn solicit a third party . . . ."  (2 LaFave, Substantive Criminal Law (2003) § 11.1(c) at pp. 195-196, fns. omitted.)

While we have not found any California cases on point, out-of-state cases so hold. For example, in *Commonwealth v. Wolcott* (2010) 77 Mass.App.Ct. 457 [931 N.E.2d 1025], the defendant told her cousin that she wanted her husband to "'just disappear'" and asked if he knew someone who could help.  (*Id*. at p. 458.)  On appeal, she argued "that without proof of her intent that [her cousin] personally kill her husband, there can be no conviction for solicitation."  (*Id*. at p. 466.)  The appellate court disagreed.  It explained: "There is no legal distinction between someone who commits a murder as an accessory as opposed to a principal; therefore, an individual who 'procures' a murder also 'commits' murder in the eyes of the law.  [Citation.]  Thus, if [the cousin] had acceded to the defendant's request and had found someone else to murder the defendant's husband, and that person had in turn personally killed her husband, [the cousin] would have been indictable for a felony.  Whether the defendant solicited [the cousin] to personally kill her husband or to find another to do so is thus of no consequence.  Either act constitutes a felony, and under either fact pattern, the defendant would be guilty of soliciting a felony." (*Id*. at p. 467.)

Similarly, in *Moss v. State* (Okla.Crim.App. 1994) 888 P.2d 509, the defendant argued that the evidence showed that she asked one Mr. Cravens to find someone else who would kill her husband, and that this did not constitute a crime.  (*Id*. at p. 517; see *id*.

12

at p. 513.)  The appellate court held that the Oklahoma solicitation statute "cover[ed] solicitation of another to find a 'hit man.'  If we were to hold otherwise, all one would have to do is place a third (or more) person in the chain and escape judgment; this does not make sense.  The heart of the crime is the solicitation." (*Id*. at p. 517; accord, *Meyer v. State* (1981) 47 Md.App. 679, 686; *State v. Furr* (1977) 292 N.C. 711, 720-721; *Johnson v. State* (Tex.Crim.App. 1983) 650 S.W.2d 784, 787; *State v. Yee* (Wis.Ct.App. 1990) 160 Wis.2d 15, 17-18.)

In his reply brief, defendant argues that he "merely asked . . . Tatarzyn to inquire about whether it would be possible to get a discount"; he did not ask Tatarzyn to inquire about actually killing his wife.  Defendant forfeited this argument by failing to raise it in his opening brief.  (*People v. Bryant* (2014) 60 Cal.4th 335, 408.)  We address it anyway, because it is readily disposed of.

A solicitation that is made subject to a condition is criminal, even if the condition is never fulfilled.  (2 LaFave, *supra*, § 11.1(c) at pp. 197-198.)  "In all likelihood, most criminal 'solicitations,' as the word is commonly understood, carry conditional offers of various types of compensations and are probably declined by the solicited party, but solicitations they would be nonetheless.  [Citation.]" (*Gardner v. State* (1979) 41 Md.App. 187, 201.)  "The crime of solicitation . . . is completed by the solicitation itself, whether or not . . . the person solicited immediately rejects it.  [Citations.]" (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1377-1378.)

Asking a hit man if you can have a two-for-one deal is, in essence, offering to pay him to commit murder, on the condition that he agree to do so for a discount price. The hit man may decline, but the crime of solicitation has nevertheless been committed. At a minimum, under the deferential substantial evidence standard of review, the jury could reasonably conclude that defendant was asking Tatarzyn to ask a hit man to murder his wife.

Defendant also argues, albeit briefly, that there was insufficient evidence that he had actually formed the intent that his wife be murdered. "Solicitation consists of the asking of another to commit one of the specified crimes with intent that the crime be committed. The intent may be inferred from the circumstances of the asking. [Citation.]" (*People v. Gordon* (1975) 47 Cal.App.3d 465, 472, disapproved on other grounds in *Stark v. Superior Court* (2011) 52 Cal.4th 368, 407, fn. 15.)

Here, defendant had a motive to have his wife murdered. Tatarzyn believed that defendant actually meant to harm his wife — so much so that she contacted Doe. When Tatarzyn returned from Tijuana and told defendant about her supposed conversation with the hit man, he said he was "willing to go through with it the whole way." Then when Tatarzyn put him in touch with Anguiano, defendant confirmed that he had a "job" for Anguiano. Defendant agreed to meet with Anguiano on Sunday at noon and to bring an address, a photo, and $300.

Defendant argues that, after Tatarzyn gave him Anguiano's phone number, he did not call Anguiano for two days, and then only after Tatarzyn supposedly "pressured" him.

14

At the time, however, defendant explained that he needed to figure out how to make the call without it being traced. Defendant also points out that he did not actually go to the meeting with Anguiano. It was abundantly clear, however, that this was only because Levinson had changed his mind.

Even more to the point, "[i]n deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

We therefore conclude that there was sufficient evidence to support defendant's conviction for solicitation of murder.[3]

III

FAILURE TO DEFINE "JOIN IN THE COMMISSION"

Defendant contends that the jury instruction regarding solicitation to commit murder erroneously failed to define the phrase "join in the commission."

---

[3] Defendant also argues that, because solicitation of Tatarzyn was "a legally inadequate theory," and because the record does not indicate whether the verdict was based on solicitation of Tatarzyn or solicitation of Anguiano, his conviction for solicitation of murder must be reversed. As just discussed, however, we do not agree that solicitation of Tatarzyn was a legally inadequate theory.

Defendant claims that there was insufficient evidence of solicitation of Anguiano, but he does not claim that solicitation of Anguiano was a legally inadequate theory.

15

A.     *Additional Factual and Procedural Background.*

Regarding solicitation to commit murder, the trial court instructed the jury, as pertinent here:

"The defendant is charged in Count 1 with soliciting another person to commit a crime in violation of Penal Code section 653f.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.  The defendant requested, asked or invited another person to commit or join in the commission of the crime of murder;

"2.  The defendant intended that the crime of murder be committed; and

"3.  The other person received the communication containing the request."

(CALCRIM No. 441.)

B.     *Discussion.*

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'  [Citations.]" (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.)

"A court has no sua sponte duty to define terms that are commonly understood by those familiar with the English language, but it does have a duty to define terms that have a technical meaning peculiar to the law.  [Citations.]  '[T]erms are held to require

16

clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance.' [Citation.]" (*People v. Bland* (2002) 28 Cal.4th 313, 334.)

Here, the prosecution argued that defendant solicited Anguiano to kill his wife. In such a case, "commit," as well as "join in the commission," have no technical meaning, beyond the legal definition of murder itself.

However, the prosecution also argued that defendant solicited Tatarzyn to solicit a hit man to kill his wife. As we indicated in part II, *ante*, a person can commit a crime as a perpetrator or as an aider and abettor. Thus, as we concluded, this could also constitute solicitation to commit murder. However, under these circumstances, "commit" and "join in the commission" may have a technical legal meaning that turns on the technical legal meaning of aiding and abetting.[4]

Here, however, the failure to give aiding and abetting instructions was harmless under any standard. The jury did not have to decide whether Tatarzyn *actually* was an aider and abettor; plainly she was not. It only had to decide whether what defendant was asking her to do was to aid and abet. Under the circumstances of this case, the key question in this determination was whether defendant himself had the necessary intent. Defense counsel was free to argue (and did argue) that defendant either was not serious or

---

[4]     Similarly, a person can commit a crime vicariously as a conspirator. (*People v. Zacarias* (2007) 157 Cal.App.4th 652, 656.) Thus, "commit" and "join in the commission" could have an additional technical legal meaning based on conspiracy.

17

else was merely asking Tatarzyn to obtain information. If, however, the jury found that defendant did intend that murder be committed, then almost by definition, he was asking Tatarzyn to aid and abet that murder. (See part II, *ante*.) It is inconceivable that, even if the jury had been given aiding and abetting instructions, it would have come to a more favorable verdict.

## IV

### THE SUFFICIENCY OF THE EVIDENCE OF DISSUADING A WITNESS

Defendant contends that there was insufficient evidence of dissuading a witness. He concedes that he tried to get Levinson to change her testimony but argues that there is no evidence that he tried to prevent her from testifying.

Dissuading a witness can be committed by:

"(1) Knowingly and maliciously prevent[ing] or dissuad[ing] any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." (Pen. Code, § 136.1, subd. (a)(1).)

"(2) Knowingly and maliciously attempt[ing] to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." (Pen. Code, § 136.1, subd. (a)(2).)[5]

---

[5] The information alleged only dissuading a witness under Penal Code section 136.1, subdivision (a)(1). However, the jury was instructed that the crime could also be committed by "*trying* to prevent or discourage" a witness from testifying. (Italics added.) Thus, it was essentially allowed to find defendant guilty, alternatively, under Penal Code section 136.1, subdivision (a)(2).

The evidence showed that defendant asked Levinson to "make right [her] statements" and to let his attorney "coach" her. In other words, he asked her to testify untruthfully. There is no evidence that he asked her not to testify at all; the People do not argue otherwise. The question, then, is whether attempting to prevent or dissuade a witness from testifying *truthfully* satisfies the statute.

"In construing [a] statute, 'we are guided by the overarching principle that our task "'is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent. [Citation.]'"' [Citation.] Our analysis begins with the language of the statute, which '"generally is the most reliable indicator of legislative intent."' [Citation.] "'""When the language of a statute is clear, we need go no further." [Citation.] But where a statute's terms are unclear or ambiguous, we may "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, . . . and the statutory scheme of which the statute is a part."' [Citation.]" [Citation.]' [Citations.]" (*In re R.V.* (2015) 61 Cal.4th 181, 192-193.)

The plain language of the statute requires an attempt to dissuade a witness "from attending or giving testimony." A witness who testifies falsely, by definition, does attend and does give testimony. Thus, the statute, on its face, does not encompass an effort to get a witness to testify falsely.

*People v. Womack* (1995) 40 Cal.App.4th 926 came to the same conclusion based on an examination of the statutory scheme. There, the defendant and several accomplices

19

attacked a witness who was cooperating in the prosecution of a third person, saying that "he should have kept his mouth shut." (*Id.* at pp. 928-929.) The defendant was convicted of attempted murder and of attempting to induce a witness to give false testimony (Pen. Code, § 137, subd. (b)). (*Womack*, *supra*, at p. 928.)

The appellate court held that these verdicts were inconsistent and that there was insufficient evidence to support the conviction for attempting to induce a witness to give false testimony. (*People v. Womack*, *supra*, 40 Cal.App.4th at p. 929.) It stated: "The entire sense of Penal Code section 137 is that testimony will be given, but the perpetrator will attempt to influence the testimony given. This is clear from a comparison of the language of sections 136.1 and 138. Section 138 punishes anyone 'who gives or offers or promises to give to any witness or person about to be called as a witness, any bribe upon any understanding or agreement that the person shall not attend upon any trial or other judicial proceeding, or . . . who attempts by means of any offer of a bribe to dissuade any person from attending upon any trial or other judicial proceeding.' [Citation.] Section 136.1 punishes anyone who '[k]nowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law' or from attempting to do so. [Citation.] These sections clearly contemplate that the perpetrator will prevent or dissuade a prospective witness from giving testimony, or will attempt to do so. Preventing or dissuading a witness from testifying altogether is incompatible with influencing or shaping the testimony the witness gives.

"To interpret these sections of part I, title 7, chapter 6 of the Penal Code, 'falsifying evidence, and bribing, influencing, intimidating or threatening witnesses,' in any other fashion is to render sections 136.1 and 138 redundant. If preventing or dissuading a witness from testifying is included in inducing a witness to withhold true testimony, as the People argue, then sections 136.1 and 138 are surplusage." (*People v. Womack*, *supra*, 40 Cal.App.4th at pp. 930-931, italics omitted and capitalization altered.)

*Womack* is persuasive, and we see no reason not to follow it. Accordingly, defendant's conviction for dissuading a witness in violation of Penal Code section 136.1 must be reversed. Defendant could have been convicted of attempting to induce a witness to testify falsely in violation of Penal Code section 137, but he was not charged with it, and it is not a lesser included offense; accordingly, we cannot simply modify the judgment. Moreover, defendant cannot be retried on this charge. (*Kellett v. Superior Court* (1966) 63 Cal.2d 822, 827; *Sanders v. Superior Court* (1999) 76 Cal.App.4th 609, 616-617.)

V

THE ADMISSION OF THE RECORDING OF

TATARZYN'S CONFIDENTIAL CONVERSATION WITH DEFENDANT

Defendant contends that the trial court erred by admitting Tatarzyn's surreptitiously recorded conversation with him.

21

A.    *Additional Factual and Procedural Background.*

When the prosecutor proposed to play the recording for the jury, defense counsel objected that it had been made without defendant's consent and thus illegally. The trial court overruled the objection.

At the next break, the trial court commented, "It looks like Penal Code section 63[3].5 provides an exception to the recording of confidential communications where . . . one party to the confidential communication reasonably believes the communications relate to the commission of a crime, a felony, involving violence against the person."

B.    *Discussion.*

"'[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.' [Citation.] A trial court has abused its discretion when its ruling '"fall[s] 'outside the bounds of reason.'"' [Citation.]" (*People v. Kopatz* (2015) 61 Cal.4th 62, 85.)

Penal Code section 632, as relevant here, provides:

"(a) Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, . . . records the confidential communication . . . shall be punished . . . . [¶] . . .

"(c) The term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto . . . .

22

"(d) . . . [N]o evidence obtained as a result of . . . recording a confidential communication in violation of this section shall be admissible in any judicial . . . proceeding."

Penal Code section 633.5, again as relevant here, provides:

"Nothing in Section . . . 632 . . . prohibits one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of . . . any felony involving violence against the person . . . . Nothing in Section . . . 632 . . . renders any evidence so obtained inadmissible in a prosecution for . . . any felony involving violence against the person . . . ."

Defendant argues that he was not charged with a felony involving violence against the person. In particular, he argues that solicitation to commit murder is not a felony involving violence against the person because (1) it does not come under part 1, title 8 (sections 187-248) of the Penal Code, entitled "Of Crimes Against the Person," and (2) it is not listed as a "violent felony" in Penal Code section 667.5, subdivision (c).

Once again (see part IV, *ante*), we start with the plain meaning of the statute. The Legislature could have specified a felony "requiring" violence or a felony that has violence as an "element"; instead, it specified a felony "involving" violence, a much broader term. Solicitation of murder is a felony "involving" violence because it "involves" murder; it requires the defendant to take a step toward causing the commission of a murder and to have the intent that murder be committed.

23

Penal Code section 633.5 is intended to allow potential victims and witnesses to record certain conversations as evidence. Typically, these are laypeople. They may be acting in fear and/or under urgent circumstances. Thus, we do not believe the Legislature intended the words "involving violence" to have some hierophantic legal meaning derived from otherwise unrelated sections of the Penal Code.

It has been held that solicitation of murder is a crime of violence for purposes of the multiple victim exception to Penal Code section 654. (*People v. Davis* (1989) 211 Cal.App.3d 317, 323-324; *People v. Williams* (1988) 201 Cal.App.3d 439, 445-446; *People v. Cook* (1984) 151 Cal.App.3d 1142, 1147.) We conclude that it is equally a felony involving violence for purposes of Penal Code section 633.5. It follows that the trial court did not err by admitting the recording.

VI

PROSECUTORIAL ERROR

Defendant raises several claims of prosecutorial misconduct.

A. *General Legal Principles*.

"'''"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' . . . To preserve a claim of prosecutorial misconduct for appeal, a defendant

must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument."' [Citation.]" (*People v. Charles* (2015) 61 Cal.4th 308, 327.)

"'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

B.     *Forfeiture*.

Preliminarily, defense counsel did not object to any of the asserted instances of misconduct. A fortiori, he also did not request an admonition regarding them. Thus, defendant's present contentions have been forfeited.

Defendant relies on *People v. Lambert* (1975) 52 Cal.App.3d 905, which stated that a prosecutorial misconduct claim "may be considered absent an objection and request for admonition if . . . 'the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict' . . . . [Citation.]" (*Id*. at p. 908.)

While *Lambert* itself has never been expressly overruled, the cases on which it relied — *People v. Perry* (1972) 7 Cal.3d 756 and *People v. Berryman* (1936) 6 Cal.2d 331 — were overruled on this point in *People v. Green* (1980) 27 Cal.3d 1, 28-34, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 233–237 and *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3. Thus, "[t]he 'close case' exception relied

upon by defendant to avoid the waiver bar is no longer recognized. [Citation.]" (*People v. Cain* (1995) 10 Cal.4th 1, 48; accord, *People v. Carrera* (1989) 49 Cal.3d 291, 321; *People v. Bonilla* (2007) 41 Cal.4th 313, 336.)

Defendant also argues that we have discretion to reach a prosecutorial misconduct claim that has not been preserved for review. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) We see no reason to exercise that discretion in this case.

Despite the forfeiture, we will also discuss defendant's prosecutorial claims on the merits, although — as will be seen — solely as an alternative ground for rejecting them.

C.　　*Appeal to Passion and Prejudice*.

In his rebuttal closing argument, the prosecutor stated:

"I'm sure you've all seen one of these before, a no soliciting sign in the window of someone's house. Maybe you have one yourself. Okay. It's no different than if the [G]irl [S]cout comes to the door, knocks on the door, person, answers the door. And . . . the person asks, 'Are you selling me cookies?' And the [G]irl [S]cout says, 'Yes.' Has the [G]irl [S]cout violated the no soliciting sign? Yes. Have they talked about what kind of cookies, how much they are, anything else? No. The details haven't been worked out. It doesn't matter. . . .

" . . . I urge you, please, please don't make the police wait to figure out what's going to happen in these situations. Don't send that message. The objective here is to catch this person before something happens. In this case, they did."

Defendant contends that this argument was an improper appeal to passion and prejudice.

"'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." [Citation.]' [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1210.)

Under federal case law, "[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear." (*United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1149; accord, *United States v. Johnson* (8th Cir. 1992) 968 F.2d 768, 769-771; *United States v. Solivan* (6th Cir. 1991) 937 F.2d 1146, 1153.)

More generally, however, "appeals to the jury to act as the conscience of the community are permissible, so long as they are not intended to inflame." (*United States v. Fields* (5th Cir. 1996) 72 F.3d 1200, 1208, fn. omitted; accord, *United States v. Grauer* (8th Cir. 2012) 701 F.3d 318, 323; *United States v. Lester* (9th Cir. 1984) 749 F.2d 1288,

27

1301; see also *People v. Adanandus* (2007) 157 Cal.App.4th 496, 513 ["The prosecution's references to the idea of restoring law and order to the community were an appeal for the jury to take its duty seriously, rather than efforts to incite the jury against defendant."].)

"[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 647.)

The prosecutor's argument here, although framed in terms of sending a message, was not inflammatory. He did not ask the jury to convict defendant to correct some broader social evil. He was merely explaining the legal meaning of solicitation by referring to the public policy considerations underlying it. Solicitation, unlike attempt, does not require a direct, unequivocal act toward committing the underlying crime. (*People v. Sanchez* (1998) 60 Cal.App.4th 1490, 1494.) Hence, it allows the police to proactively prevent worse crimes from occurring.

Accordingly, this argument did not constitute prosecutorial error.

D.     *Mischaracterization of the Evidence*.

According to the evidence at trial, on Friday, July 12, 2013, after Doe called the police, a female deputy phoned Tatarzyn. Tatarzyn asked if it would be appropriate to record her conversations with defendant; the female deputy said yes.

28

On Monday, July 15, 2013, however, when Tatarzyn spoke to Investigator Cornett, he told her not to make a recording, because "[he] didn't want to put her in danger."

Tatarzyn also testified:

"Q. . . . [Y]ou made that recording Monday night on behalf of the police department, didn't you?

"A. Yes.

"Q. Because . . . the deputy on Friday told you to make a recording; right?

"A. If I felt the need to, yes."

At the request of defense counsel, the trial court gave a jury instruction on entrapment. (CALCRIM No. 3408.) This stated, in part: "A person is entrapped if a law enforcement officer or the officer's agent engaged in conduct that would cause a normally law-abiding person to commit the crime." It also stated: "As used here, agent is a person who does something at the request, suggestion, or direction of an officer."

In his closing argument, defense counsel claimed that Tatarzyn had entrapped defendant. For example, he asserted: "[S]he's trying to sell this job. . . . [S]he's really pushing this thing." "[Defendant] never mentioned hitman until she brought it up." He also asserted that Tatarzyn was acting as an agent of the police: "[S]he seemed to be the lead investigating officer and prosecutor in this case." "And remember, she's doing this on behalf of the sheriff's department. The gal, the deputy on the phone told her to record the conversation with [defendant]."

29

In his rebuttal closing argument, the prosecutor stated: "An agent is a person that does something at the request, suggestion, or direction of an officer. When Officer Cornett said, 'Do not record him,' [Tatarzyn] was not acting as an agent. Even though that earlier officer may have suggested, 'Well, maybe you can try to record it,' another officer after that said, 'Don't do that. It's not safe for you. I don't want you to do it.' So when she records him, she's not an agent."

Defendant contends that the prosecutor mischaracterized the evidence by stating that Tatarzyn was not an agent of the police.

It is misconduct to "misstate or mischaracterize the evidence [citation] . . . ." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1154, italics omitted, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal. 4th 390, 421, fn. 22.) However, "[t]he prosecution is given wide latitude during closing argument to vigorously argue its case and to comment fairly on the evidence, including by drawing reasonable inferences from it. [Citations.]" (*People v. Lee* (2011) 51 Cal.4th 620, 647.) A prosecutor is not "required to discuss his view of the case in clinical or detached detail. [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 463.) A prosecutor's statements may even be "hyperbolic and tendentious," as long as they are reasonable inferences from the evidence. (*People v. Rowland* (1992) 4 Cal.4th 238, 277.)

Defendant concedes that, "[g]iven the conflicting evidence in the record, whether . . . Tatarzyn was an agent of the Sheriff's Department was an open question." Nevertheless, he concludes that "it was misconduct for the prosecutor to mischaracterize

the evidence as though it conclusively established that she was not an agent." Actually, the correct conclusion is the exact opposite — because it was a reasonable inference that Tatarzyn was not an agent, the prosecutor was free to assert flatly that she was not. Where the evidence is in conflict, a prosecutor need not give a neutral and even-handed summary. That is not what a closing argument is for.

In his reply brief, defendant contends for the first time that the challenged remark constituted misconduct on the theory that the prosecutor expressed a personal belief in his guilt.

Defendant forfeited this contention by failing to raise it in his opening brief. (*People v. Bryant*, *supra*, 60 Cal.4th at p. 408.) In any event, it is wide of the mark. The prosecutor argued that Tatarzyn was not an agent based on the evidence. He did not use the words "I," "me," or "my"; he did not ask the jury to take his word for it. (See *People v. Edwards* (2013) 57 Cal.4th 658, 742 [prosecutor's statement that defendant was "killer" was not expression of personal belief].) Thus, again, this argument did not constitute prosecutorial error.

E. *Arguing a Legally Inadequate Theory.*

Defendant contends that the prosecutor committed misconduct by arguing a legally inadequate theory — namely, that asking Tatarzyn to ask a hit man in Tijuana for a "two-for-one deal" constituted solicitation. In part II, *ante*, we rejected defendant's claim that this was a legally inadequate theory. We reject this claim of prosecutorial error for the same reasons.

31

F. *Charging Defendant Under Penal Code Section 136.1 and Arguing That the Jury Should Convict Him Under Penal Code Section 136.1.*

As already discussed in part IV, *ante*, defendant contends that there was insufficient evidence that he dissuaded a witness in violation of Penal Code section 136.1. He concludes that the prosecutor committed misconduct by charging him under this section and by arguing to the jury that he was guilty.

This is a somewhat novel type of prosecutorial misconduct claim. Defendant relies on cases holding that it is misconduct to misstate the law in closing argument. (E.g., *People v. Hill* (1998) 17 Cal.4th 800, 830-831.) Defendant, however, does not point to any particular misstatement of law. Rather, his real claim is that the prosecutor misstated the result of applying the law to the facts. We would be reluctant to hold that this is misconduct, because it would discourage prosecutors from arguing novel applications of the law and would penalize them in hindsight for failing to predict future legal interpretations.

Fortunately, we need not decide the question. In part IV, *ante*, we reversed defendant's conviction under Penal Code section 136.1 and held that this charge cannot be retried. The asserted misconduct could not possibly have been prejudicial in any other way. Accordingly, the asserted misconduct is moot.

# VII

## DISPOSITION

Defendant's conviction for dissuading a witness (Count 4) is reversed.  If the trial court had realized that it could not sentence defendant on this count, it might have made some of its other discretionary sentencing choices differently.  (See generally *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1256-1259.)  For example, it might have run Count 2 consecutively rather than concurrently.  Accordingly, the entire sentence is reversed and the matter is remanded for resentencing.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.

We concur:

MILLER
J.

CODRINGTON
J.