Filed 9/12/25  P. v. Kumar CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SANJAY KUMAR,<br><br>    Defendant and Appellant. | H053184<br>(Sacramento County<br>Super. Ct. No. 22FE006373) |

Defendant Sanjay Kumar appeals from the judgment entered after he was convicted by a jury of multiple sex offenses against two children, both under the age of 14.  Appointed counsel for Kumar filed an opening brief which provides the procedural and factual background of the case but raises no legal challenge to the disposition.  Counsel asks this court to conduct an independent review of the record to determine whether there are any arguable issues.  (See *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).)  Kumar was advised of the right to file written arguments on his own behalf, and he has submitted two letters raising various concerns.  Finding no arguable error that would result in a disposition more favorable to Kumar, we affirm the judgment.[1]

---

[1] On April 10, 2025, after briefing was complete, the appeal was transferred from the Third District Court of Appeal to this court for decision.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## *A. Procedural background*

On November 8, 2022, the Sacramento County District Attorney filed an amended complaint, deemed an information, charging Kumar with one count of committing a lewd act on D. Doe,[2] a child under 14 years of age (Pen. Code,[3] § 288, subd. (a); count 1); nineteen counts of committing forcible lewd acts on D. Doe, a child under 14 years of age (§ 288, subd. (b)(1); counts 2 through 20); and ten counts of committing forcible lewd acts on Y. Doe, a child under 14 years of age (§ 288, subd. (b)(1); counts 21 through 31).

The information alleged that, as to all counts, Kumar committed the offenses against more than one victim and also alleged the following aggravating factors: 1) the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Rule 4.421(a)(1));[4] 2) the victims were particularly vulnerable (Rule 4.421(a)(3)); 3) the crimes involved planning, sophistication, or professionalism (Rule 4.421(a)(8)); and 4) Kumar took advantage of a position of trust or confidence in committing the offenses (Rule 4.421(a)(11)).

Following a trial, a jury convicted Kumar on all counts. The jury further found true the aggravating factors that the victims were particularly vulnerable; the offenses involved planning, sophistication, or professionalism; and that Kumar took advantage of

---

[2] The two victims in this case, D. Doe and Y. Doe, were identified throughout the proceedings below by their first names along with the Doe designation. To better protect their privacy interests, we use only their first initials. (Cal. Rules of Court, rule 8.90(b)(4).) Unspecified rule references are to the California Rules of Court.

[3] Unspecified statutory references are to the Penal Code.

[4] After the close of evidence and prior to the jury commencing deliberations, the court granted the district attorney's motion to strike this aggravating circumstance.

a position of trust or confidence, as well as the special allegation that Kumar committed the offenses against more than one victim.

After finding that Kumar was ineligible for probation under section 1203.066, the trial court sentenced Kumar to a total term of 276 years, consisting of consecutive upper terms of eight years each on counts 1 through 17, and consecutive upper terms of 10 years each on counts 18 through 31. The trial court noted that it was imposing the upper term on each count based on the jury finding the aggravating circumstances to be true and that consecutive terms were mandatory under section 667.6, subdivision (d) due to the jury finding that the offenses were committed against more than one victim. The trial court awarded a total of 734 days of credit, consisting of 639 days of actual credit plus 95 days of conduct credit.

As to fines and fees, the trial court imposed a $5,000 restitution fund fine (§ 1202.4, subd. (b)), a $5,000 parole revocation fund fine (§ 1202.45, suspended pending successful completion of parole), a $620 court operations assessment (§ 1465.8); and a $465 criminal conviction assessment (Govt. Code § 70373).

Kumar timely appealed.

**B. Factual background**

**1. Prosecution's case**

**a. D. Doe's testimony**

At the time of trial, D. Doe was 19 years old[5] and was living with her mother, P.S., her half-sister, S.K., her half-brother, A.K., and A.K.'s mother, A.P. D. Doe's younger sister, Y. Doe, and Kumar also used to live in the house. Kumar began seeing her mother in 2007, but they did not marry. At the time he began dating D. Doe's mother, Kumar

---

[5] D. Doe testified that she was born in 2004.

3

was married to another woman, A.P.,[6] and, at the time of trial, Kumar and A.P. were still married.

When D. Doe was four years old, the family moved to an apartment in South Sacramento, and they lived there until she was ten years old. After about two years of living in that apartment in South Sacramento, A.K. and his mother, A.P., also moved in. A.K. is younger than D. Doe, but older than Y. Doe.

When D. Doe was four years old, she remembered that Kumar touched her "private areas" while she was in bed. D. Doe would sleep with Y. Doe in a queen-sized bed. Kumar and P.S. slept in a separate bedroom. Kumar would come into the bedroom as D. Doe slept, lay down on the bed, and put his hands inside her pants. D. Doe could feel Kumar's fingers moving inside the outer layer of her vagina but not inside "the hole." D. Doe did not remember how long Kumar had his fingers on her vagina, but she remembers him asking her if she liked it. D. Doe testified that, even though she did not enjoy what he was doing, she nodded her head because she was scared of him.

Around that same time, D. Doe went to preschool and a teacher asked about some scars on her legs. She lied[7] and said they were from playing soccer, but after talking to someone else, the police were notified, and D. Doe spoke to a police officer. The officer asked D. Doe to point to a figure on a drawing and show where she had been touched. D. Doe remembered that she pointed to the figure's vagina.

D. Doe testified that, even after she spoke to the police officer, Kumar continued to touch her but she did not attempt to tell anyone else because she was scared.[8] When

---

[6] Kumar testified that he and A.P. married in 2000.

[7] D. Doe subsequently testified that Kumar gave her the scar by throwing "a bowl at [her] knee as [she] was leaving." D. Doe was not asked any clarifying questions about this event.

[8] As discussed below, in section I.B.1.c., it does not appear that police spoke to Kumar or undertook any further investigation of D. Doe's report.

4

she was six years old, Kumar started touching her breasts and her rear end, as well as her vagina. Kumar also began to touch her with his penis and his tongue, along with his fingers.

D. Doe estimated that, between the age of six and twelve years old, Kumar touched her vagina with his fingers "[a]lmost every other night" and always in the same way. D. Doe described this touching would occur when she was in bed at night with her half-sister, S.K., and Kumar would come into the room to tuck S.K. into bed. Y. Doe and A.K. were also in the room. As he tucked S.K. in, Kumar put his hand under D. Doe's blanket and inside her pants. D. Doe could feel his fingers moving on her vagina, as he used two fingers to try to open the outer part of her vagina and "go inside."

D. Doe described when Kumar began touching her vagina with his penis. The first such instance she could recall took place in her mother's room, again when she was around six years old. Kumar told her to come into the room. D. Doe's mother was taking a shower in the adjoining bathroom, though the door was closed. D. Doe was reluctant to go into the room because she did not want him to touch her vagina. After she entered the room, Kumar closed the door. He picked D. Doe up, placed her on the bed, and pulled her pants down to her knees. Kumar told her they needed to be cautious so they would not get caught. Kumar then pulled down her underwear and pulled his pants down. He put his penis on her vagina and rubbed it back and forth on the "inner layer" of her vagina. Kumar then said, " 'I leaked' " and stopped rubbing. Kumar wiped his penis with a cloth and pulled her pants back up, telling D. Doe, " 'your mom almost saw.' "

Another time, D. Doe was in her room doing homework while the other children were playing outside. Kumar came into her room and closed the door behind him. D. Doe testified "[Kumar] would come in and he would ask, beg, if we can do that again," saying it was " 'our secret.' " Kumar would pull her pants down and rub his penis on her

5

vagina. D. Doe estimated that, between the ages of six and 12, Kumar rubbed his penis on her vagina more than 100 times.

D. Doe testified that Kumar touched her vagina with his tongue, but she could not remember how old she was when this first happened.[9] D. Doe was in her room and Kumar entered and closed the door. D. Doe was on the corner of her bed and Kumar told her to lie down. Kumar pulled her pants down to her knees then got down on his knees and put his tongue on her vagina. D. Doe said that he began licking the "inner layer" of her vagina. D. Doe wanted him to stop but did not say anything because she was scared of him. Kumar had told her previously that if she told anyone what was happening " 'we would both be in trouble.' " D. Doe estimated that, between the ages of six and 10 years old, Kumar put his tongue on her vagina more than 50 times and, between the ages of 11 and 12, about 30 times.

D. Doe testified further that, when she was living at the apartment in South Sacramento, she was not feeling well and was in the bathroom throwing up. Kumar came in and comforted her, patting her back. He took D. Doe's hand and put it inside the front of his pants, telling her to grab his penis. Kumar pulled her hand out of his pants and told her to put it in her mouth. He then took her hand and put it in her mouth for her, asking D. Doe what it tasted like. D. Doe testified this kind of incident happened more than 10 times, but Kumar did not always put her hand in her mouth afterwards.

Again, when D. Doe was living in South Sacramento, Kumar entered the bathroom while she was showering. He told her to be quiet, then opened the shower door. Kumar reached in with one hand, rubbed his fingers on her breasts and stared at

---

[9] D. Doe remembered that these acts took place when they lived in the apartment in South Sacramento when she was between four and 10 years old, and also in the house where they lived when she was 11 and 12.

her.[10] Kumar rubbed her breasts like this between 10 and 15 times when she lived in South Sacramento and around five or so more times when she was 11 and 12 years old.

D. Doe testified that when she was 12, Kumar drove her and her siblings to school. Kumar had dropped off the other children first and had D. Doe move to the front passenger seat. Kumar began touching her thighs as he drove her to school and she was scared, thinking his fingers would touch her vagina. On Wednesdays, D. Doe did not have to be at school until 9:00 a.m. so he would take her to his body shop to wait. As they were in the shop, Kumar would beg her to let him touch her private parts. He would then put his hands down her pants, inside her underwear, and put his fingers inside her vagina.[11] D. Doe estimated that Kumar touched her thighs in the car "[m]ore than ten [times]" and touched her vagina while in the body shop "[a]round 20" times.

On at least five occasions when Kumar touched D. Doe's vagina in his body shop, he also put his hand in the back of her pants and touched her perineum. She testified that Kumar had touched her rear end when she was younger than 12 years old, but she could not recall any specifics about it. D. Doe remembered that some of the times that Kumar touched her vagina, he also touched her "butt [and] perineum."

D. Doe did not tell her mother, P.S., about any of Kumar's sexual abuse. When D. Doe had talked to the police when she was in preschool, her mother was present but was not supportive of D. Doe's disclosure. Starting when D. Doe was around four years old,

---

[10] On cross-examination, D. Doe admitted that when she described these shower incidents to Sacramento County Sheriff's Detective Melanie Marino, she told the detective that Kumar did not touch her breasts but " 'just looked at me weird.' " D. Doe testified further that, at the time of the interview with Marino, her memory was not at its "best."

[11] D. Doe clarified that Kumar's fingers were between the outer labia but "not in the hole" of her vagina.

Kumar would "slap [her] head over every little inconvenience[]" "[a]lmost every day." P.S. would see this happening, but she never stopped Kumar from hitting D. Doe.

One day, when D. Doe was in middle school, she put on some "ripped" jeans to wear to school. When Kumar saw the jeans, he told her she could not wear them and said she should go back inside and change. D. Doe got angry at Kumar and screamed, " 'It's okay for you to rape little girls but not allow them to wear ripped jeans.' " Her mother and Y. Doe were present when D. Doe was yelling at Kumar, but her mother did not react. Kumar "was in disbelief" and said, " 'Rape?' " D. Doe began crying because she felt as if no one believed her. D. Doe also told Kumar, " 'You're not my dad. You can't tell me what to do.' " On cross-examination, D. Doe admitted that she hated Kumar and wanted her mother to stop seeing him. However, D. Doe denied that she was lying about what Kumar had done to her.

One day when she was in high school, D. Doe was talking to Y. Doe about their best friends and "how we have secrets." During that conversation, Y. Doe told D. Doe that Kumar had been touching her, and D. Doe told Y. Doe that he had been touching her as well.

Y. Doe and D. Doe believed they should tell their grandmother what Kumar had been doing to them. When D. Doe talked to her grandmother, she was "pretty vague" about what Kumar was doing. However, her grandmother did not do anything about what D. Doe had disclosed. On cross-examination, D. Doe said that she also told her younger half-sister, S.K., "[v]aguely" about what Kumar had done to her, but did not go into detail.

D. Doe testified there were no other adults in the family who made her feel safe, including her mother. D. Doe said that her mother "watched as [Kumar] would hit [her] every single day" so D. Doe felt her mother would not believe her about the abuse. D. Doe was reluctant to talk to her biological father about the molestation because it was

8

sexual in nature. D. Doe also did not tell A.P. because A.P. was married to Kumar and would "listen to whoever has more authority." In the household, Kumar was "very abusive" and therefore had more authority.

In October 2021, while D. Doe was still living with her mother, she gave a statement to Sacramento County Sheriff's Detective Melanie Marino about the abuse. Her mother told her if anyone in the family heard about D. Doe being molested, D. Doe would not be able to marry.

### b. Y. Doe's testimony

Y. Doe was 17 years old at the time of trial and was living with her grandmother, her biological father, and her uncle. When she was younger, Y. Doe lived with her mother, P.S., from Monday through Friday and with her father during the weekend. Y. Doe remembered when she was four years old, she lived in South Sacramento with her mother, Kumar, D. Doe, her half-sister, S.K., her half-brother, A.K., and A.K.'s mother, A.P. Y. Doe did not like living in the house with Kumar because he would hit her, slapping her on the head, for "little things" such as "talking too loud with [her] siblings."

Y. Doe testified that the first time she could remember Kumar touching her inappropriately was when she was around nine or 10 years old. Y. Doe was going to sleep in the bedroom she shared with D. Doe and S.K. Kumar entered the bedroom to check if S.K. was asleep, then he knelt down and took the blanket off Y. Doe. Kumar pulled off Y. Doe's shorts and underwear to her knees and tried to spread her legs. When he could not, Kumar pulled Y. Doe's clothing down to her ankles and pushed her knees apart. Kumar then started licking Y. Doe's vagina. Y. Doe was scared but pretended to be asleep the whole time because she was afraid Kumar would hit her. After two or three minutes, Kumar stopped, pulled her clothing back up, replaced the blanket, and left the room. Y. Doe testified that Kumar would put his mouth on her vagina "almost every week" when she was between nine and 12 years old.

9

Close in time to the first incident of him licking her vagina, Y. Doe remembered Kumar came into the bedroom and reminded her to use the bathroom as Y. Doe had a bedwetting problem at the time. When Y. Doe returned to the bedroom and climbed into the top bunk, Kumar stood next to her and pulled her blanket aside. Kumar told Y. Doe, " 'shh' " and pulled her shirt up. Kumar started rubbing her nipple with his fingers for two or three minutes after which he pulled her shirt back down and left.

Around the same time Kumar first put his mouth on her vagina, he would touch her vagina with his fingers. The first instance she could remember was when she was sleeping in the top bunk. Y. Doe was falling asleep and did not hear Kumar come in the room but felt him removing her blanket. Y. Doe pretended to be asleep, and he pulled her pants and underwear down to her ankles. Kumar spread her legs and started circling her vagina and clitoris with his fingers. Y. Doe testified that Kumar would do this to her "at least once a week" from the age of nine or 10 up until she was 12 years old.

Y. Doe remembered that, on one occasion, Kumar tried to insert a finger into her vagina. However, his finger would not go in and it hurt her, so he stopped. Y. Doe could not recall the details of this incident and could not remember if it took place in her bunk bed or when she was sleeping on the couch.

When Y. Doe was 10 or 11 years old, she was playing in the living room with her siblings. Her mother called to her and told her that Kumar wanted her to do something for him. Y. Doe did not want to go to Kumar because she knew he would touch her, so she told her mother she did not want to go. Her mother insisted so Y. Doe went out to see what Kumar wanted. Kumar had her come over to a part of the yard where they could not be seen and started kissing her on the lips, using his tongue. Kumar also grabbed her buttocks over her clothing, then moved his hand under her pants and underwear, continuing to squeeze her buttocks. Y. Doe tried to pull away but was not

10

strong enough. As Kumar was kissing her, she could feel his erect penis against her stomach.

Y. Doe testified that Kumar kissed her again on her first day of eighth grade when she was 13 years old. Kumar drove to her school that morning and pulled the car over, put his hand on the inner thigh of her left leg and kissed her. Y. Doe told him she just wanted to go to school and, after about three minutes, he stopped and drove her to her school. In all, Y. Doe could recall Kumar kissing her on the mouth four times when she was between nine and 11 years old.

Y. Doe testified that when she was 10 or 11 years old, Kumar made her touch his penis. Y. Doe was in the backyard and asked Kumar for help putting on her helmet so she could ride her bicycle. Kumar took her right hand, unbuttoned his pants, and put her hand inside his pants, wrapping it around his penis. Y. Doe testified that Kumar's penis was erect. Y. Doe was shocked and does not remember if anything else sexual happened, though Kumar put her helmet on her and pinched her on the neck.

On one occasion, when Y. Doe was in sixth grade, she neglected to hang up her school uniform and her mother began yelling at her to do so. When Kumar heard Y. Doe's mother yelling at her, he grabbed Y. Doe by the back of her neck and dragged her to the closet in her bedroom. Y. Doe told him he was not her father and had no right to hit her. Kumar got very angry and pushed her really hard.

Y. Doe testified that when she was about 14 years old, her mother spoke up against Kumar when he was yelling at Y. Doe. Y. Doe began to record him with her phone, and her mother began to yell at Kumar, asking why he was yelling at D. Doe and Y. Doe over "little things."

Y. Doe tried telling her half-sister, S.K., her mother, and her grandmother what Kumar was doing. When she was around 12 years old, Y. Doe told D. Doe, who said that Kumar was molesting her too and that Y. Doe should tell their mother. Y. Doe called her

11

mother, but her mother did not let her go into detail, instead cutting her off and finally hanging up.

When Y. Doe was 15 years old, she went for her annual physical and decided to tell her doctor about the abuse. Y. Doe's doctor informed the police.[12]

In response to Y. Doe's disclosure, her mother told her that she was lying, and that, if anyone found out, no one would marry Y. Doe because she would be "considered dirty and impure."

### c. Detective Marino's testimony

Marino testified that she interviewed D. Doe and Y. Doe in October 2021. D. Doe was 17 years old at the time and Y. Doe was 15. D. Doe told Marino that Kumar began molesting her when she was four years old up until she was 12. She reported that Kumar would touch her genitals with his fingers, his penis, or his mouth every night or every other night from the ages of six to 12 years old D. Doe told Marino that Kumar put his hands on her buttocks between 40 to 50 times, touched her bare chest with his hands approximately 20 times, and put his hand on her body around 40 to 50 times as he drove her to school. At some point during the interview, D. Doe told Marino she had been told to keep Kumar's molestation a secret.

Marino discovered a patrol officer report and CPS reports from 2009 in which D. Doe had reported that Kumar was molesting her.[13] However, the police did not interview D. Doe or conduct any further investigation in response to that 2009 report.

---

[12] Dr. Shirley Chen testified that she was Y. Doe's pediatrician and that, at the beginning of this particular exam, Y. Doe told Dr. Chen she did not feel safe at home. After Dr. Chen obtained some basic details about the molestation, she called Child Protective Services (CPS).

[13] These reports were apparently produced when D. Doe disclosed to someone at her preschool that Kumar had molested her.

Y. Doe told Marino that Kumar molested her from the time she was nine years old up until she was 12. Between the ages of nine and 10, Kumar put his mouth on her vagina about every other night, put his fingers on her vagina about three to four times, and put his hand on her breast two or three times. When Y. Doe was 10, Kumar placed her hand on his penis two or three times. When she was 10 to 11 years old, Kumar kissed her eight to 10 times.

### d. Expert testimony

Dr. Blake Carmichael testified regarding child sexual abuse accommodation syndrome (CSAAS) as an expert on the issue of child sexual abuse and the effects of child sexual abuse on children. Dr. Carmichael testified that he did not know the victims in this case, had not interviewed anyone involved in the case, reviewed any reports about the case, and had not been provided with any of the case details. According to Dr. Carmichael, the closer the relationship between the child victim and the perpetrator, the longer it may take for the child to disclose the abuse. Where a child perceives that other adults are "permissive or not standing up to" the abuser, the child may assume that reporting the abuse would be futile.

When the abuse is continuous over a long period of time, the report of abuse can appear unconvincing and inconsistent. However, these inconsistencies can be the result of how memories are formed when something traumatic has become normalized. For example, Dr. Carmichael testified that a child reported to him that he had been abused "[e]leventy billion" times. While this number may make the report seem unconvincing, Dr. Carmichael explained that it is typically because children "aren't good at abstract things." Children have difficulty with "time, sequence, order, [and] duration" especially when it comes to traumatic events, which distort a victim's memory and sense of time.

## 2. Defense case

### a. A.K.'s testimony

A.K., Kumar's son, who was 19 years old at the time of trial, testified that he lived with Kumar, his mother, A.P., his half-sister, S.K., as well as P.S. and his stepsisters, D. Doe and Y. Doe, in South Sacramento beginning when he was in second or third grade. In 2015, when he was around 11 years old, they moved to a different residence in Sacramento.

The residence in South Sacramento had two bedrooms and one bathroom. The three girls slept on beds in the living room while A.K. and his mother slept in one bedroom and P.S and Kumar slept in the second bedroom. At some point, A.K.'s mother moved to Fiji, so the three girls shared a bedroom with A.K. When A.K.'s mother returned, she slept in the living room.

While they were living in South Sacramento, A.K. never saw Kumar touching D. Doe or Y. Doe inappropriately in any part of the house or outside. He also never saw Kumar hit or slap either of the girls.

When they all moved to a mobile home park in Sacramento, the mobile home had three bedrooms and two bathrooms. In this residence, D. Doe, Y. Doe, and S.K. were in one bedroom with a bunk bed, with A.K. and his mother in a second bedroom, and Kumar and P.S. in the third. A.K. never stayed in the girls' bedroom. Y. Doe slept in the top bunk, while D. Doe and S.K. shared the bottom bunk. At the mobile home, A.K. never saw Kumar touch either D. Doe or Y. Doe inappropriately, nor did he see Kumar hit either of the girls.

When A.K. was interviewed by police in October 2021, he told Detective Marino that D. Doe, Y. Doe, and Kumar would frequently argue when they lived in the mobile home. However, there were no such arguments when they lived in South Sacramento.

14

### b. Kumar's testimony

Kumar testified on his own behalf. Kumar has a son, A.K., with A.P. and a daughter, S.K., with P.S. Although he is still married to A.P.,[14] Kumar has been in a romantic relationship with P.S. since 2007. At the time, he and P.S. began their relationship, she was still married. P.S. had two children with her husband, D. Doe and Y. Doe, and then she had S.K. with Kumar in 2008.

Before he began his relationship with P.S., Kumar was good friends with her husband, who was also a customer at Kumar's body shop. After Kumar started seeing P.S., her husband stopped being his friend, and D. Doe and Y. Doe began to call Kumar "kutta" which is Hindi for "dog."

Kumar began splitting his time between the home he rented for his wife and son, and the home he rented for P.S. and her children. In 2010, P.S., her children, and Kumar moved into a duplex in South Sacramento and A.P. and A.K. moved there as well in 2012. Kumar and P.S. slept in the master bedroom, the girls slept in the second bedroom, and A.P. and A.K. slept in the living room.

In 2015, the families moved to the mobile home park in Sacramento, which had three bedrooms and two bathrooms. Kumar and P.S. stayed in one bedroom, while A.K. and A.P. shared a second bedroom, and the three girls slept in bunk beds in the third bedroom. The girls' bunk bed had a pull-out bed, and sometimes Y. Doe would sleep in the pull-out.

Kumar denied touching either D. Doe or Y. Doe inappropriately. P.S. was in charge of disciplining D. Doe and Y. Doe, but Kumar could verbally tell them not to do something wrong. Kumar never physically disciplined either girl.

---

[14] Kumar testified that his religion does not allow for divorce and does not have a word for it.

15

When Y. Doe was around three or four years old, she developed a bedwetting problem. Y. Doe would wear a diaper to bed and later changed to wearing pull-ups. The issue stopped when Y. Doe was in sixth grade. Kumar testified that P.S. would usually check Y. Doe's diaper at night, but sometimes she asked him to do it. Kumar would go in, climb up on the bunk bed and feel Y. Doe's diaper, but he would not put his hand inside.[15] Y. Doe was always awake when he did so, and if her diaper was wet, Kumar would tell her to go to the bathroom and change it.

When the families were living in South Sacramento, Kumar felt he had a good relationship with D. Doe and Y. Doe. Their relationship changed when the girls started going to middle school, when D. Doe was 13 or 14 years old, and Y. Doe was 10 or 11. Kumar testified that the girls began telling him that he was not their father and they stopped respecting him. As their attitude toward him got worse, he stopped talking to them entirely in 2018. Kumar believed that the girls' biological father, P.S.'s husband, had turned them against him.

Kumar admitted that he got in an argument with D. Doe about her trying to wear ripped jeans to school. When Kumar saw what she was wearing, he asked why she was wearing " 'this and going to school in this cold weather … it does not look good.' " Kumar was shocked when D. Doe shouted at him that it was " 'not okay if [she] wear[s] ripped jeans, but it's okay for [Kumar] to rape little girls?' " P.S. and Y. Doe were present when this happened, and Kumar asked D. Doe what she was talking about. D. Doe did not say anything else, and she went to school. Kumar did not discuss the accusation with P.S.

---

[15] On cross-examination, Kumar testified that sometimes he would have to put his hand inside Y. Doe's diaper because "when it was wet for a long time, you could not tell from outside."

### c. S.K.'s testimony

S.K., Kumar's daughter with P.S., who was 15 years old at the time of trial, testified that when the families lived in South Sacramento, all the children slept in the same room. She shared a bed with A.K., while D. Doe and Y. Doe shared a second bed. Kumar would sometimes come into the bedroom to check on them, but she never saw him touching D. Doe or Y. Doe.

D. Doe and Y. Doe would argue with Kumar and Kumar would hit them, "like you would [] a bad child." S.K. said that Kumar's "reasons to hit them" were "[s]ometimes … unreasonable." Kumar, D. Doe, and Y. Doe did not have a good relationship.

Kumar was in charge of disciplining the children. Kumar would yell at her and A.K. if they did not follow the rules but would not hit them. Kumar would hit D. Doe and Y. Doe. At times, S.K. felt that Kumar was "hitting them just to hit them." S.K. remembered that, on one occasion, she and Y. Doe were talking to each other in their bedroom and Kumar just came in, grabbed Y. Doe by her hair, and dragged her out of the room. Kumar was angry, but S.K. had no idea what prompted him to do what he did.

S.K. was seven years old when they moved to the mobile home park. Again, she never saw Kumar touch D. Doe or Y. Doe inappropriately. She heard D. Doe arguing with Kumar about wearing ripped jeans to school and heard D. Doe's comment about how Kumar thought it was " 'okay to rape little girls.' "

### d. P.S.'s testimony

P.S. testified that she considered Kumar to be her husband, "according to our religious ceremony in [a] Hindu way." P.S. was responsible for disciplining her daughters, though she gave Kumar permission to do so as well. P.S. never saw Kumar physically discipline her daughters and, if she had, she "would have stood for them." P.S. subsequently testified that Kumar did hit the children, but "nobody was hitting them every day."

17

P.S. said she never saw Kumar touch D. Doe or Y. Doe inappropriately and neither of the girls ever reported to her that Kumar had molested them. When D. Doe and Kumar were arguing about her wearing ripped jeans to school, P.S. heard D. Doe say to Kumar, " 'We can't wear ripped jeans, but it's okay for you to rape little girls?' " Kumar responded, " 'What is she talking?' " When P.S. questioned her daughters afterward, they "did not reply" but said, "don't talk about this." P.S. "tried, in many ways, to ask them, but always, they did not reply." P.S. did not think to go to the police, because she "did not feel that anything like this was happening."

P.S. first learned that D. Doe and Y. Doe were claiming Kumar was molesting them when she was at the doctor's office with Y. Doe. P.S. denied telling D. Doe and Y. Doe that, in their culture, if it became known they had been molested, they would be considered dishonored and could not marry. However, P.S. admitted that "[t]hey heard about it from outside."

### 3. Prosecution's rebuttal

Detective Marino testified that in her interview with Kumar in October 2021 he told her that, when he was bathing D. Doe and Y. Doe, he would wash their vaginas and that "his fingers may have slipped into their vaginas but not all the way." Kumar also told Marino that both D. Doe and Y. Doe had bedwetting issues and, three or four times a week, he would check their diapers at night, putting his hand inside their diapers or pull ups.

## II. DISCUSSION

### A. March 12, 2025 letter brief

In his initial letter brief, filed in the Third District Court of Appeal on March 12, 2025, before the matter was transferred to this court, Kumar denies hitting or molesting D. Doe or Y. Doe and contends the accusations were "made-up by [their] father, grandma and [their] step mother [*sic*]." Kumar also claims that Detective Marino "made-up" the

18

statements as well.  The bulk of this letter consists of arguments as to why the victims' allegations could not be true.

At the end of the letter, Kumar lists several reasons why he is entitled to a new trial, as follows: 1) he was not provided a "Fiji Islands Hindi Dialect interpreter" at trial and that the Punjabi Indian interpreters were insufficient; 2) some prospective jurors who insisted on "proof and evidence" instead of " 'He says' 'She says' " were excused from service; 3) several witnesses were not called to testify on his behalf, including his private investigator and "both daughters' live-in nanny;" and 4) the prosecutor asked "lead[ing]" questions of her witnesses "several times."

### B. May 21, 2025 letter brief

After the case was transferred to this court, Kumar was again advised of his right to file written arguments and, in response, he filed a second letter brief on May 21, 2025. In that brief, he describes his religious background as well as his personal history of immigrating to this country and becoming successful through hard work.  Kumar again argues that the victims' accusations were fabricated by their biological father and grandmother who "practiced and performed witchcraft (voodoo) on both."

At the end of this letter, Kumar again repeats the reasons listed in his March 5, 2025 letter supporting his request for a new trial, namely: 1) he was not provided a "Fiji Islands Hindi [d]ialect interpreter" at trial and that the Punjabi Indian interpreters were insufficient; 2) some prospective jurors who insisted on "proof and evidence" were excused from service; 3) several witnesses were not called to testify on his behalf, including his private investigator; and 4) the prosecutor asked leading questions of an unidentified witness "several times."  To this list, Kumar adds the following: 1) he "was not given [the] chance to speak to prove [his] innocence;" 2) although he did testify, he was told by defense counsel he could only "ask questions through him" and could not

19

"ask any questions by himself;" and 3) the trial judge went "off the record" "[m]any times."

We are not persuaded by Kumar's arguments.

To the extent that Kumar contends that the accusations against him were fabricated or the result of "witchcraft," this is merely an attempt to ask this court to reweigh disputed evidence that the trier of fact resolved against him. We are bound by the jury's resolution of such factual disputes. (*People v. Perry* (1972) 7 Cal.3d 756, 785.)

As to Kumar's claim that he should have been provided a "Fiji Islands Hindi [d]ialect interpreter" at trial, we acknowledge that a defendant has a constitutional right to an interpreter. (Cal. Const., art. I, § 14.) However, Kumar did not request a Fiji Islands Hindi dialect interpreter below, nor did he contend that the interpreters provided could not adequately translate the proceedings for him. It is well-settled that " ' "[a]n appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought ... , where an objection could have been, but was not, presented to the lower court by some appropriate method ... ." ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 589–590.) The rationale for this rule is that " ' "it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial." ' [Citation.]" (*Id.* at p. 590.)

We construe Kumar's remaining claims as claims of ineffective assistance of counsel. Specifically, those claims are that favorable prospective jurors were improperly excused, defense counsel failed to call witnesses on his behalf, defense counsel failed to object to the prosecutor's leading questions, defense counsel failed to object to the trial court going "off the record," and defense counsel failed to allow him to speak on his own behalf when he took the stand.

The standard for evaluating claims that counsel provided constitutionally ineffective assistance is set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687–

694, which states: "[t]o secure reversal ... upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

After a careful review of the record, we discern no basis to conclude trial counsel's performance fell below an objective standard of reasonableness and therefore Kumar has not established that counsel provided ineffective assistance.

Pursuant to *Wende, supra*, 25 Cal.3d at p. 436, we have reviewed the entire record. We find no arguable error that would result in a disposition more favorable to Kumar.

### III.  DISPOSITION

The judgment is affirmed.

21

_____
WILSON, J.

WE CONCUR:


_____
DANNER, ACTING P. J.



_____
BROMBERG, J.




*The People v. Kumar*
H053184